Jeffrey L. JACKSON, Appellant–
Plaintiff,

v.

UNION–NORTH UNITED SCHOOL
CORPORATION By and Through its
BOARD OF SCHOOL TRUSTEES and
Dennis E. Bettcher, Robert H. Albert,
Robert D. Blount, Greg Huff, Dale L.
Albert, and Ronnie R. McCartney, Ap-
pellees–Defendants.

No. 46A03–9011–CV–508.

Court of Appeals of Indiana,
Third District.

Dec. 16, 1991.

James A. Masters, Nemeth, Masters & Leone, South Bend, for appellant-plaintiff.

Peter G. Tamulonis, Donald L. Dawson and John B. Drummy, Kightlinger & Gray, Indianapolis, for appellees-defendants.

GARRARD, Judge.

## I. Facts and Procedural History

This is an appeal from the LaPorte Circuit Court challenging the trial court's grant of summary judgment in favor of a school corporation and school bus drivers. The trial court ruled that a school corporation's renegotiation of six transportation contracts did not violate the public bidding statutes because the renegotiation was expressly authorized under IC 20-9.1-2-13. We reverse.

Appellant Jeffrey L. Jackson (Jackson) challenged the legality of six school bus route contracts between Appellee Union–North United School Corporation (School Corporation) and six school bus drivers, Appellees Dennis E. Bettcher, Robert H. Albert, Robert D. Blount, Greg Huff, Dale L. Albert, and Ronnie R. McCartney (School Bus Drivers).

The School Corporation solicited public bids for bus route contracts. The contracts were for the period encompassing the 1989–90 through 1992–93 school years. On or about April 24, 1989, the School Corporation received, opened, and tabulated bids for the transportation contracts. At the May 24, 1989 school board meeting the School Corporation accepted twenty bids, and awarded contracts to the successful bidders based on their respective bids. The School Corporation entered into an "Agreement of Understanding" at the May 24, 1989 school board meeting with those whose bids were accepted, and the agreement listed, among other items, the amount of an individual's accepted bid and the route he or she was awarded. The agreement contemplated that a formal contract for the awarded routes would be executed at a later date.

On or about June 26, 1989, the formal school transportation contracts were submitted to the school board for the signatures of the individual board members. The twenty contracts were signed by the school board members. Six of the formal transportation contracts approved by the board were for greater amounts than listed in the agreements of understanding entered into at the May 24, 1989 board meeting.

The School Corporation, through its Superintendent, Dr. David L. Pruis, acknowledged that six of the original agreements had been renegotiated at some point between the May 24 award of the contracts and the June 26 signing of the contracts.

The School Corporation entered into an "Addendum to Contract" with the six school bus drivers which stated that a new and higher per diem rate was awarded to drivers who had expressed an intention to purchase new buses. The new buses did not contain greater seating capacities than the buses they replaced.

Jackson brought suit as a resident and taxpayer in the School Corporation's township and county. He filed suit in the St. Joseph Superior Court on October 16, 1989, and, on the School Corporation's motion for change of venue, the suit was transferred to and docketed in the LaPorte Circuit Court. Jackson sought to have the six contracts which were for higher rates than the originally accepted public bids declared illegal and void. He requested that the School Corporation be enjoined from spending any public funds on the contracts over and above the amounts of the bids accepted and the agreement signed on May 24, 1989. Jackson claimed the total difference between the amount of the bids accepted and the contracts awarded was approximately $56,784.00.

Jackson alleged that the School Corporation and School Bus Drivers violated both the Indiana Open Door Law and the public bidding statutes. The School Corporation and the School Bus Drivers filed motions for summary judgment, claiming that Jackson's Open Door claim had not been filed within the statutory time limit, and that the renegotiation of the transportation contracts was justified by the express provisions of IC 20–9.1–2–13 which allowed such renegotiation for the purchase of different equipment.

The trial court granted the School Corporation's and the School Bus Drivers' motions for summary judgment on both counts.

## II. Issue

■ The sole issue on appeal is:

Whether the trial court erred in granting summary judgment in favor of the School Corporation and the School Bus Drivers by finding that IC 20–9.1–2–13 expressly allowed the renegotiation of the transportation contracts in this case for the purposes of purchasing new equipment (buses).[1]

## III. Discussion and Decision

■ Jackson contends the trial court erred by ruling that IC 20–9.1–2–13 allows the School Corporation to renegotiate the School Bus Driver's transportation contracts. We agree. Jackson is appealing from a trial court ruling granting summary judgment in favor of the School Corporation and the School Bus Drivers. We will reverse the grant of a summary judgment motion if the record discloses an unresolved issue of material fact or an incorrect application of the law to those facts. *Jones v. City of Logansport* (1982), Ind.App., 436 N.E.2d 1138, 1143. We find that the trial court has incorrectly applied the law to the facts of this case.

Jackson's primary contention on appeal is that the renegotiated contracts hint of favoritism because they were privately renegotiated at higher amounts without notice to other prospective bidders just a few weeks after the School Corporation had publicly solicited, accepted, and awarded bids. He urges that the renegotiation violates the public bidding statutes that have been established by the legislature to govern the fair issuance of school transportation contracts. Specifically, we note that the School Corporation is required to give at least 10 days' notice to the public prior to beginning negotiations for transportation contracts. IC 20–9.1–2–7. Otherwise, negotiations are not to occur. *Id.*

The School Corporation and the School Bus Drivers do not dispute that the contracts were renegotiated without notice to the public. However, they successfully alleged at the trial court level that by its express language IC 20–9.1–2–13 allowed

---

1. Jackson does not address the trial court's determination that his action under the Indiana Open Door Law was untimely. Therefore, that issue is waived for purposes of appeal. *Matter of Adoption of H.S.* (1985), Ind.App., 483 N.E.2d 777, 780; Indiana Rules of Procedure, Appellate Rule 8.3(A)(7).

the renegotiation of the contracts for the purpose of acquiring different equipment. The statute provides:

> Sec. 13. Transportation or Fleet Contracts, Change of Equipment. The governing body may require the school bus driver or fleet contractor to furnish equipment with greater seating capacity at any time. When a school bus driver or fleet contractor is required to furnish different equipment during the term of the contract, the contracting parties may mutually agree to the cancellation of the existing contract, and renegotiate a new contract for the balance of the term of the original contract. Action taken by a governing body under Section 12 of this chapter shall not preclude simultaneous exercise of authority under this Section.

IC 20–9.1–2–13.

 Under the statutory language of IC 20–9.1–2–13, a contract must exist in order for renegotiation to occur. The trial court correctly found that a contract existed when the agreements of understanding were signed on May 24, 1989. In Indiana the written proposal of a public entity for work to be done, the written bid of a party to do the proposed work, and the written acceptance of such bid by the proper authorities, constitutes a contract to do the proposed work, even though a formal contract to do the work has not been executed. *See Wiles v. Hoss* (1887), 114 Ind. 371, 16 N.E. 800, 805. In this case, more than a mere written acceptance existed. The School Corporation executed a detailed agreement signed by it and the School Bus Drivers. Although the agreements of understanding by their terms contemplated a formal contract would be executed later, the writings evidenced that The School Corporation and the School Bus Drivers were in agreement on the material terms of the contracts to be executed. The bidders offered to drive the routes for specified amounts and the School Corporation accepted their offers. The School Corporation and the School Bus Drivers signed the agreements promising to carry out the agreed upon terms. Because a valid offer, acceptance, and consideration existed, we agree with the trial court that a binding contract existed when the agreements of understanding were signed.

Furthermore, the language used in the agreements of understanding show that they were meant to be contracts. The pertinent language reads:

> [F]ailure to comply with the requirements contained in the specifications will nullify *this and any other contractual agreement* which may be executed by and between the Union North School Corporation and [the proposed bidder] ... Furthermore, it is agreed and understood that *this shall be considered part of the contractual agreement to be executed.* (emphasis added)

(R. pp. 24, 27, 30, 33, 36, 39.)

We conclude that on the basis of the language of the agreements of understanding, contracts were formed between the School Corporation and the School Bus Drivers on May 24, 1989.

 Jackson contends that even if a contract existed between the parties as of May 24, 1989, that the contracts were not renegotiated during their "term" because the first school year during which the routes would be driven under the contracts had not yet commenced. He apparently construes the word "term" of the contract to mean time for performance under the contract. Jackson cites no authority for his proposition. While we agree that the bus routes were not to begin being serviced under the contracts until the beginning of the 1989–1990 school year, we construe the word "term" of the contract to mean the period of time from which the contract becomes binding to the conclusion of the contract. Accordingly, the term of the contracts began when the agreements of understanding were signed on May 24, 1989, and the renegotiations which occurred within the next month were "during the term of the contract".

Jackson also contends that the statute can be interpreted as permitting the renegotiation of a transportation contract only where the driver/contractor is required to furnish equipment with seating capacity greater than that of the equipment the

driver originally agreed to furnish. The trial court rejected Jackson's interpretation and construed the statute as allowing for the renegotiation of a transportation contract if the driver/contractor is required to furnish other equipment than he/she originally agreed to furnish, even if the equipment does not have greater seating capacity. We disagree. Examination of the statute reveals that the only change of equipment intended to be authorized by the legislature as a basis for renegotiation under the statute was one involving increased seating capacity.

In construing a statute, foremost is a determination, albeit in hindsight, of the legislature's intent. *Ind. State Highway Comm'n v. Bates & Rogers Constr.* (1983), Ind.App., 448 N.E.2d 321, 324. The best evidence of legislative intent is the language of the statute itself. *Bailey v. Menzie* (1987), Ind.App., 505 N.E.2d 126, 128. The language used in a statute is deemed to have been used intentionally. *Burks v. Bolerjack* (1981), Ind., 427 N.E.2d 887, 890, citing *Combs v. Cook* (1958), 238 Ind. 392, 151 N.E.2d 144.

The trial court agreed with the School Corporation and the School Bus Drivers that because the second sentence of IC 20-9.1-2-13 does not contain the phrase "with greater seating capacity" to modify the word "equipment" that other changes of equipment were intended and authorized by the legislature. We interpret the statute differently. The two sentences appear together in one section of a comprehensive statute. They state:

> The governing body may require the school bus driver or fleet contractor to furnish equipment with greater seating capacity at any time. When a school bus driver or fleet contractor is required to furnish different equipment during the term of the contract, the contracting parties may mutually agree to the cancellation of the existing contract, and renegotiate a new contract for the balance of the term under the original contract.

IC 20-9.1-2-13. Although the legislature chose not to modify "equipment" in the second sentence with "greater seating capacity", it did modify "equipment" with the term "different." Our reading of the statute is that "equipment with greater seating capacity" in the first sentence is the "different equipment" referred to in the second sentence. The lead sentence in the paragraph gives us its subject. Accordingly, the legislature intended the section to apply only to required equipment changes involving greater seating capacity. In this case, the new buses purchased by the School Bus Drivers as the basis for renegotiating their contracts with the School Corporation did not have greater seating capacities. Thus, those equipment changes were not authorized under the statute. We also note that in the context in which it is employed, the term "equipment" in the statute clearly refers to a bus or other vehicle which is the subject of a transportation contract rather than mere parts or additions to it.

Although neither the parties nor the trial court addressed this issue, IC 20-9.1-2-13 also states that the equipment changes that allow for contract renegotiations of school transportation contracts are changes that are "required" by the governing body. In our case, we find nothing in the record indicating that the School Corporation required that the six bus drivers buy new buses. Instead, the documents pertaining to this dispute reveal that the School Corporation offered to renegotiate the contracts with drivers who would buy new equipment. We do not find that the new buses were "required" under the clear meaning of the statutory language of IC 20-9.1-2-13.

Paragraph 7 of a School Corporation document titled "Information For Persons Wishing To Bid On Bus Routes", considered part of the specifications, provides in relevant part:

> In the interest of safety and efficiency of operation, drivers are *strongly encouraged* to provide equipment (i.e. bus body and chassis) which was manufactured *after* 1978. Each driver *should* adopt a plan for replacement of his/her bus not less frequently than every ten (10) years. While the corporation is

aware of the costs involved for new buses, failure to update each bus which is placed in service for transporting students places the driver and the school corporation in a precarious position. Where applicable, each driver is *encouraged* to submit two (2) bids:

> 1) bid the route(s) with current equipment, and if the equipment (i.e. bus) is older than 1983,
>
> 2) bid the route(s) with equipment which was manufactured in or after 1983.

Please note: When routes come up for bids again in 1993, the Union–North United School Corporation will not accept any bids with equipment that was manufactured prior to 1985 at the time the bids are received.

(emphasis added) (R. pp. 72–73.)

The above quoted passage demonstrates that the School Board strongly encouraged drivers to provide newer equipment, and separate bids were even accepted for newer buses. However, nowhere does the passage or other specifications or contract provisions "require" that new buses be purchased for the six routes at issue in this case. In fact, even the addenda to the formal contracts which were executed for the six drivers who purchased new buses did not state that the drivers had been required to purchase the new buses, but rather the addenda in relevant parts stated:

> Each individual who has notified the Office of Superintendent of his/her intention to purchase new equipment, and has reached agreement regarding a new per diem rate for his/her route based upon the use of new equipment, agrees and understands ...

(R. pp. 26, 29, 32, 35, 38, 41.)

Based on these statements and others found in the record, there is no factual dispute that the new buses and the renegotiation of the contracts were not "required" by the School Corporation, but were the result of mutual agreement. Accordingly,

IC 20–9.1–2–13 is not satisfied and the renegotiation cannot be authorized by the equipment statute. Because we find that the School Corporation's renegotiation of the School Bus Driver's contracts in this case were not for "equipment with greater seating capacity" and were not equipment changes "required" by the School Corporation, we find that IC 20–9.1–2–13 does not authorize a private renegotiation of the awarded contracts in contravention of the public bidding statutes.[2] The trial court's decision to the contrary in its grant of summary judgment is, therefore, overruled.

Reversed and remanded for proceedings consistent with this opinion.

BARTEAU, J., concurs.

STATON, J., dissents and files separate opinion.

STATON, Judge, dissenting.

I respectfully dissent.

I believe the majority construes Indiana Code 20–9.1–2–13 too narrowly. The majority states, "Examination of the statute reveals that the only change of equipment intended to be authorized by the legislature as a basis for renegotiation under the statute was one involving increased seating capacity." At 858. My examination of the statute reveals otherwise.

My view of the statute imparts a twofold purpose: 1) to permit the "governing body" (here the School Corporation) to require bus drivers to obtain buses with more seats; and 2) to allow for the renegotiation of the contract when a bus driver is asked by the School Corporation to obtain different equipment during the term of the contract, whether the "equipment" is a bus with greater seating capacity, additional safety features to be implemented on an existing bus, or any other capital expenditure on the part of the bus driver resulting from a directive from the "governing body." This reading is supported by the

---

2. Our decision is based solely on our interpretation of IC 20–9.1–2–13. We do not address the merits of other defenses that were raised by the School Corporation and School Bus Drivers at the trial court level.

apparent legislative purpose for renegotiation.

The bus driver naturally factors the cost of capital into his bid for the job. His assumption is that the cost of capital will remain constant or fairly constant—it is a "fixed cost" of doing business. When the School Corporation requests an additional capital outlay, however, his fixed costs change. In return for his acquisition of a newer, larger, or safer bus, he must service a larger debt. He is faced with the choice of increasing the price for his services or absorbing the increased expenses, though the increase in his costs resulted neither from his own actions nor the natural fluctuations of the market.

The "renegotiation clause" in the statute is a legislative recognition that in return for the School Corporation's ability to change the rules in the middle of the game, the bus driver should be given an opportunity to right the uneven playing field. This rationale holds true whether the required capital investment is a bus with greater seating capacity or whether it is a bus of the same seating capacity. If the legislature intended that the second sentence of Indiana Code 20–9.1–2–13 apply only to a situation where a bus driver is required to furnish "equipment with greater seating capacity" it would have so provided. I would hold that the statute authorizes renegotiation of the contract regardless of what the required capital investment might be.

The majority *sua sponte* raises the issue of whether the drivers were "required" to buy new buses within the meaning of the statute. As the majority observes, the record reveals that this issue was not raised by the trial court or either party. This issue was not explored by affidavits or other supporting materials permitted by Trial Rule 56, nor was the School Corporation notified that it should present argument on the issue at the hearing on sum-

mary judgment. Accordingly, I would hold that the issue is waived and is not a proper basis for reversal.[1] *Franklin Bank and Trust Co. v. Mithoefer* (1990), Ind., 563 N.E.2d 551, 553; *Prell v. Trustees of Baird & Warner Mortg.* (1979), 179 Ind.App. 642, 386 N.E.2d 1221, 1227, *trans. denied.*

I would affirm the judgment of the trial court.

1. I would also note that under the present rules, Trial Rule 56(H) would not permit us to reverse the trial court's grant of summary judgment on an issue of fact which was not specifically designated to the trial court. However, Trial Rule 56(H) became effective on January 1, 1991;

summary judgment was entered on July 25, 1990.