**In re the COMMITMENT OF A.N.B.**

**No. 41A01–9209–CV–304.**

Court of Appeals of Indiana,
First District.

May 17, 1993.

Pamela Carter, Atty. Gen., Victoria M. Ransberger, Deputy Atty. Gen., Office of Atty. Gen., Indianapolis, for appellant.

Stephen L. Huddleston, Franklin, for appellee.

BAKER, Judge.

Sixteen-year-old A.B., found to be "schizo-affective, paranoid, suicidal, [and] satanical," desperately requires "long-term educational, structured, locked residential protective placement[.]" *Record* at 21. The trial court ordered the Indiana Division of Mental Health[1] to assume all financial responsibility for A.B.'s care, maintenance, and educational needs as of May 11, 1991, the day A.B. was involuntarily committed. Must the Division pay as ordered?

The Division claims 1) under no circumstances can it be held responsible for the cost of A.B.'s care pending admission to a state facility, and 2) under the present circumstances it cannot be held responsible for A.B.'s care once A.B. is admitted to a state facility. We agree and therefore reverse.

## FACTS

As in *In re the Commitment of T.J.* (1993), Ind.App., 614 N.E.2d 559 the operative facts underlying A.B.'s involuntary commitment are not contested. A.B. was abused during her early childhood. She suffers from visual and auditory hallucinations, paranoia, and severe depression. She has threatened to locate and kill her biological mother. She has attempted suicide because the devil so commanded. She

is not able to be educated properly through normal classroom instruction. On April 25, 1991, A.B.'s adoptive parents reluctantly filed a petition for her involuntary commitment.

After serving notice to the Division and appointing counsel for A.B., the trial court held A.B.'s involuntary commitment hearing on May 6, 1991. On May 17, 1991, the trial court found A.B. to be "mentally ill" and ordered her committed to Larue D. Carter Memorial Hospital in Indianapolis, a state mental health institution, which a local coordinating committee had advised was the most appropriate and least restrictive facility for A.B.'s placement.

The trial court anticipated—correctly, as it turns out—that Larue Carter would be unwilling to accept A.B. due to a chronic shortage of beds. It ordered that in the event Larue Carter refused A.B.'s immediate placement, A.B. was to be committed to the Division for placement pursuant to IND.CODE 12-26-2-9, which provides that if the patient is refused admission because of inadequate resources, the Division "shall make arrangements" for admission to an "appropriate facility."[2] Moreover, pending A.B.'s admission to Larue Carter or other appropriate facility, the trial court ordered the Division to assume financial responsibility for A.B. as follows:

> It is further ORDERED the Commissioner of Indiana Department of Mental Health shall assume all financial responsibility for the care and maintenance of [A.B.] effective May 11, 1991 and that the Commissioner be responsible for [A.B.'s] educational needs as provided by law.

*Record* at 22 ("Paragraph 5").

In the meantime, the trial court both ordered A.B. to remain in private care at

---

1. Formerly the Department of Mental Health.

2. Although the term "appropriate facility" is no longer statutorily defined, its former meaning (appearing in IND.CODE 16-14-9.1-1(i)) appears to have been substantially incorporated into the current definition of "facility," which, for purposes of IND.CODE 12-26, is defined as:

   a psychiatric hospital, a community mental health center, another institution, or program:

   (A) where a mentally ill individual can receive rehabilitative treatment, or habilitation and care, in the least restrictive environment suitable for the necessary care, treatment, and protection of the individual and others; and

   (B) that has adequate space and treatment staff appropriate to the needs of the individual as determined by the superintendent of the facility.

   The term includes a child caring institution. IND.CODE 12-7-2-82.

Our Lady of Mercy Hospital in Dyer, Indiana, and sent a copy of the order to the Division. It is Paragraph 5—requiring the Division to assume financial responsibility for A.B. as of May 11, 1991—the Division challenges today.

As expected, Larue Carter claimed it had inadequate resources to accept A.B. and refused to admit her.[3] Despite A.B.'s desperate situation, and despite its obligation under IND.CODE 12–26–2–9, the Division made no arrangements to place A.B. in an alternative facility, and "in the meantime" turned from days and weeks into months. Finally, on November 6, 1991, almost six months later, Larue Carter admitted A.B.

## DISCUSSION AND DECISION

At the outset we wish to commend the parties for their superior presentations at oral argument held April 28, 1993. Both sides' preparation and candor greatly heightened our understanding and aided our review of the dispute.

As a second preliminary matter, we observe that unlike *In re the Commitment of T.J., supra,* in this case the Division has relinquished its personal jurisdiction challenge. At oral argument, the Division conceded the notice it received was adequate and acknowledged that its primary concern was the trial court's requirement that it bear the cost of A.B.'s treatment. Thus, we address the financial question only.

Article IX, Sec. 1 of the Indiana constitution obligates the General Assembly "to provide, by law, for the support of institutions for the education of the deaf, the mute, and the blind; and for the treatment of the insane." The term "insane" encompasses those individuals who are "mentally ill." *In re Mental Commitment of M.P.* (1987), Ind., 510 N.E.2d 645, 646. The duty to provide treatment for the mentally ill is also statutory. *Id.;* IND.CODE 12–27–2–1. As discussed below, the General Assembly has allocated the costs of commitment to the patients, their families, the counties,

and the State, depending on the particular circumstances of each case.

Responding to its constitutional and statutory obligations, the General Assembly created and funded a Division of Mental Health, *see* IND.CODE 12–21–1–1, and several mental health facilities like Larue Carter, but these have proven to be woefully inadequate to meet the current demand. Recognizing the limitations of the existing state institutions, the General Assembly authorized the Division's director to contract with approved community mental health centers for the care of those patients for whom there is simply inadequate space or staff at the state facilities. *See* IND.CODE 12–21–2–7; IND.CODE 12–26–2–9. Indeed, due to insufficient resources, it is now common for patients to be "farmed out" to private facilities pending admission to state institutions. As we understand it, even these private facilities are overwhelmed.

### Care Pending Admission

Chapter 10 of IND.CODE 12–26 governs care pending admission to a facility. Once the trial court has committed a mentally ill individual, the trial court "shall consult with the superintendent or the attending physician concerning the method of caring for the individual pending admission to the facility." IND.CODE 12–26–10–1. The trial court may then order temporary placement in the "least restrictive suitable facility[.]" IND.CODE 12–26–10–2. An individual may not be confined in a county jail unless the individual is found to be dangerous and violent, there is no other suitable facility available, and the trial court orders placement in a county jail. IND.CODE 12–26–10–3. Finally,

[i]f the comfort and care of an individual are not otherwise provided:

1) from the individual's estate;

2) by the individual's relatives or friends; or

---

3. As it was permitted. "The superintendent of a facility to which the commitment of an individual is to be transferred may decline to admit the individual if the superintendent determines that

adequate space, treatment staff, or treatment facilities appropriate to the needs of the individual are not available." IND.CODE 12–26–11–2.

3) through financial assistance from the division of family and children or a county department;

the trial court may order the assistance furnished and paid for out the general fund of the county.

IND.CODE 12–26–10–4. Because the Division is simply not one of the entities that may be held responsible for the cost of assisting A.B. pending admission to a state facility, *In re the Commitment of T.J., supra,* we must instruct the trial court to strike that portion of Paragraph 5 requiring the Division to bear the cost of A.B.'s care pending admission to a state facility. Johnson County will be liable for the cost of A.B.'s "care and comfort" pending admission only if that aid is not otherwise provided by A.B.'s relatives, friends, the division of family and children, or a county department.

### *Care Upon Admission*

■ Once the individual had been admitted to a state institution, liability for the cost of the patient's treatment and maintenance is governed by IND.CODE 12–24–13–1 *et seq.* The financial burden falls upon the patient or the patient's "responsible parties."[4] IND.CODE 12–24–13–4(b) ("each patient in a state institution and the responsible parties, individually or collectively, are liable for the payment of the cost of treatment and maintenance of the patient").[5] The sole exception to the general rule of the Division's non-liability is given in IND.CODE 12–24–13–5, which reads in part as follows:

(a) Whenever placement of a handicapped child (as defined in I[ND].C[ODE] 20–1–6–1) in a state institution is necessary for the provision of special edu-

cation for that child, the cost of the child's education program, nonmedical care, and room and board shall be paid by the division rather than by the child's parents, guardian, or other responsible party.

Thus, the General Assembly has limited the Division's liability to only the cost of the child's education program, nonmedical care, and room and board, and then only if the child is handicapped and the child's placement in a state institution is necessary for the provision of special education. In all other cases, the Division is not financially responsible for the costs of treatment and maintenance.

A "handicapped child" is an individual between the ages of three and twenty-two and "who, because of physical or mental disability is incapable of being educated properly and efficiently through normal classroom instruction, but who with the advantage of a special educational program may be expected to benefit from instruction in surroundings designated to further the educational, social, or economic status of the child." IND.CODE 20–1–6–1(1). The determination of whether a child is handicapped and in need of special education services is made by a "case conference committee." *See* IND.CODE 20–1–6–2.1(a)(5)(A); 511 IAC 7–12–1(j); *In re the Commitment of T.J., supra.*

■ In A.B.'s case, as in T.J.'s case, no case conference committee met to determine whether A.B. was a handicapped child. Rather, it was a local coordinating committee which met and suggested an appropriate treatment plan.[6] Because A.B. has not properly been designated as a "handicapped child" by a case conference

---

**4.** For the purposes of IND.CODE 12–24–6, 12–24–13, 12–24–14, and 12–24–15, a "responsible party" includes any of the following:

(1) The patient.
(2) The parents of the patient if the patient is not more than eighteen (18) years old.
(3) The spouse of the patient.
(4) The estate of the patient.
(5) A legal guardian of the patient in the guardian's representative capacity.
(6) A trustee of the patient if the trust authorizes payment for the care, treatment, maintenance, or support of the payment.

IND.CODE 12–7–2–169(a). The term does not include the children of the patient. IND.CODE 12–7–2–169(b).

**5.** In passing, we observe the General Assembly has authorized the Division to accept payment at a lesser rate than that otherwise prescribed. IND.CODE 12–24–14–6.

**6.** Local coordinating committees have been established in each county. IND.CODE 31–6–14–1 *et seq.* Their role is primarily to review a child's proposed "restrictive" placement (as that term is defined in IND.CODE 31–6–14–5), devel-

committee, IND.CODE 12–24–13–5(a) is inapplicable, and the Division can not yet be held liable for A.B.'s special education program, nonmedical care, and room and board. These burdens fall upon A.B. and her responsible parties.

Because a case conference committee has not yet determined A.B. is a handicapped child, A.B. is not yet entitled to the special education benefits of IND.CODE 12–24–13–5(a), nor to nonmedical care and room and board. And although Paragraph 5 does not limit itself to special education alone, we have been unable to uncover any authority requiring the Division to bear the cost of A.B.'s non-special education. Because the Division is not liable for A.B.'s treatment and maintenance under IND.CODE 12–24–13–4, nor for her special education program, non-medical care, and room and board under IND.CODE 12–24–13–5(a), nor for a general education, we instruct the trial court to strike the remainder of Paragraph 5.

*Conclusion*

The trial court erroneously ordered the Division of Mental Health to assume financial responsibility for A.B.'s care and maintenance both before and after November 6, 1991, the day A.B. was admitted to a state mental health facility. The Division is not one of the entities listed in IND.CODE 12–26–10–4, governing the liability for costs pending admission, and therefore is not to be held financially responsible. Moreover, the Division is not financially liable for the costs of treatment and maintenance of those patients who have been admitted to a state facility; those burdens must be shouldered by the patient or his or her responsible parties. If the patient is a "handicapped child," the Division must assume the costs of special education, non-medical care, and room and board. Here, no case conference committee determined A.B. was a handicapped child.

██ We are sympathetic to Judge Eggers, who recognized the problems of bu-

reaucratic red tape and inadequate legislative funding and tried to hurdle them on A.B.'s behalf. Plainly, the Division breached its duty under IND.CODE 12–26–2–9 to "make arrangements for the individual's admission to an appropriate facility" once Larue Carter refused to admit A.B. on account of inadequate funding. Further, we consider it particularly telling that the trial court correctly anticipated the Division would breach its obligation. The statutory and administrative scheme, however, is neither ill-conceived nor irrational, and the General Assembly acted within its prerogative when it allocated the financial burdens as it did. Should an interested party wish to compel the Division or some other agency to perform a particular duty, like making arrangements for placement, the proper procedure is to institute an action in mandamus. *In re the Commitment of T.J., supra.*

We are more sympathetic to A.B., however. Desperately in need of treatment, A.B. was excluded from the Division's care for nearly six months. We recognize, of course, that the Division cannot manufacture bed space without adequate funding from the General Assembly and that waiting lists are currently a regrettable fact of life. Nevertheless, we trust this appeal has served some useful purpose, even if only to call attention to the inadequacy of current resources. Before one may remedy a problem, one must first realize it exists.

We reverse and instruct the trial court to strike Paragraph 5, requiring the Division to assume financial responsibility for A.B.'s care, maintenance, and education.

Judgment reversed.

ROBERTSON and BARTEAU, JJ., concur.

op and recommend long range treatment plans, consider alternative placements and treatments, and make appropriate recommendations. *See* IND.CODE 31–6–14–11. Their role is strictly advisory. *Matter of Tina T.* (1991), Ind.App.,

579 N.E.2d 48. A case conference committee, on the other hand, is geared toward planning the individual's education. Its composition and obligations are set forth in 511 IAC 7–12–1 *et seq.*