**In re CONTEMPT OF WABASH VALLEY HOSPITAL, INC.**

No. 37A03–0408–CR–359.

Court of Appeals of Indiana.

May 4, 2005.

William E. Emerick, Barry L. Loftus, Trenten D. Klingerman, Karen R. Orr, Stuart & Branigin LLP, Lafayette, IN, for Appellant.

Steve Carter, Attorney General of Indiana, Frances H. Barrow, Deputy Attorney General, Indianapolis, IN, for Appellee.

Angela M. Smith, Hall, Render, Killian, Heath & Lyman, P.S.C., Indianapolis, IN, for Amicus Curiae Indiana Hospital & Health Association.

Linda J. Cooley, Libby Y. Mote, Krieg DeVault LLP, Indianapolis, IN, for Amicus Curiae Indiana Council of Community Mental Health Centers, Inc.

## OPINION

VAIDIK, Judge.

### Case Summary

The trial court found P.H. eligible for 72-hour emergency detention because he was mentally ill and dangerous. It ordered him to be admitted to Wabash Valley Hospital, Inc., the community mental health center ("CMHC") serving Jasper County. When the hospital declined to accept P.H. under the emergency detention order, the trial court found the hospital in contempt, assessing monetary penalties and jailing two hospital administrators. We hold that the trial court has authority to determine whether the hospital's refusal to admit P.H. accorded with the law, but we vacate the contempt order and remand for further proceedings because the trial court gave the hospital no opportunity to explain its decision to deny admission to P.H.

### Facts and Procedural History[1]

On June 2, 2004, the State charged P.H. with criminal trespass. After the defen-

---

1. We heard oral argument in this appeal on February 28, 2005, in our courtroom in India-

dant entered a not guilty plea, the trial court ordered a competency evaluation.

On July 20, 2004, while P.H. was incarcerated at the Jasper County Jail, the Chief Deputy Sheriff applied for emergency detention of P.H. The application recited that P.H. had declined to take prescribed medication and "ha[d] become increasingly violent and out of control," threatening jail personnel and other inmates. Appellant's App. p. 15–16. As part of the application, a physician at Jasper County Hospital certified that P.H. "may be mentally ill and dangerous, as those terms are defined in Ind.Code § 12–7–2–130(1) and Ind.Code § 12–7–2–56." *Id.*

The trial court judge endorsed the application, the form order stating "I hereby authorize any police officer to take [P.H.] to _____ to be detained, examined and given such emergency treatment as necessary for the preservation of the health and safety of the patient and the protection of persons or property." *Id.* at 16. The form did not name a facility for P.H.'s emergency detention, leaving that space blank.

The Sheriff's Department contacted Wabash Valley Hospital after the trial court approved the emergency detention, and two physicians at the hospital declined to accept P.H. at that time.

On July 21, 2004, the day after the emergency detention order was signed, the prosecuting attorney filed a Rule to Show Cause reciting that the trial court "entered a court order committing [P.H.] to the Wabash Valley Hospital" and that "Wabash Valley Hospital has refused to comply with said court order." *Id.* at 17. The trial court set the matter for hearing the next day.

At the hearing on the Rule to Show Cause, the Chief Deputy Sheriff testified that, when Wabash Valley Hospital declined to accept P.H., P.H. was taken to Jasper County Hospital where he remained strapped to a bed. The Chief Deputy Sheriff described his conversation with physicians at Wabash Valley Hospital, indicating that they stated that the hospital had bed space available.[2]

Also at the hearing, the hospital's attorney introduced the two hospital administrators who were named in the Rule to Show Cause, stating, "they are more than willing and able to . . . testify this morning about what they've done." *Id.* at 36. The trial court heard no evidence from the hospital and found the hospital and its administrators in contempt. At the hearing, the judge stated:

> Here, here's the problem, counsel. This started on Monday with your out-patient clinic, not our facility. Now it's Thursday and I have a mental health patient sitting in my hospital with my county paying all the bills and you're the catch basin, and you had an order to put that person somewhere. Now you refused not only that night, but entirely for the next two (2) days you refused. This is my problem, and this is the third time

---

napolis. We thank counsel for the parties and *amicus curiae* for their helpful presentations. We also extend our thanks to *amici curiae* Indiana Health and Hospital Association and Indiana Council of Community Mental Health Centers, Inc., for their beneficial briefs.

**2.** The record contains no other information about whether the hospital had bed space. At oral argument, the hospital noted that bed space does not equate directly to capacity to accept an inpatient, particularly one who may be dangerous, because of limits on the types of inpatients that may be kept in certain beds, limits on availability of qualified staff, and other factors.

that this has happened this year.[3] I get references from physicians at the hospital telling me that it's after seven o'clock, they're not taking anybody because they just absolutely will not, and so we end up with people at the hospital, not trained, no facilities to handle it, and no reference to any place to go. These are people we're supposed to deal with, and I've had it and so has the police department and so have the county commissioners. It's my recommendation to the county commissioners we find a new placement district through the state and that we disenfranchise ourself with this facility, because three (3) times is three (3) too many.

*Id.* The trial court ordered the two hospital officers present at the hearing, Rick Crowley and Craig Lysinger, to serve twenty-four hours in the Jasper County Jail.[4] He also ordered the hospital to reimburse Jasper County for the medical expenses for keeping P.H. at the Jasper County Hospital and for the cost of police officers at the hospital. The court also ordered the hospital "instanter to find an appropriate placement facility for the Defendant, [P.H.]." *Id.* at 39.

At 5:30 p.m. on the day the contempt judgment was entered, P.H. was admitted to Wabash Valley Hospital pursuant to a new application for emergency detention. The State dismissed the criminal charges five days later.

Wabash Valley Hospital and its officers appealed the contempt judgment, including the order of incarceration and the orders to pay money to Jasper County to cover

the county's costs before P.H. was ultimately placed at Wabash Valley Hospital.

### Discussion and Decision

### I. The Hospital's Legal Duty

■ A fundamental issue in this case is whether the hospital is required by law to accept patients such as P.H. when courts order temporary detention under Indiana Code § 12–26–5–2. This is an issue of law, and we therefore review it *de novo. Shepherd v. Carlin,* 813 N.E.2d 1200, 1203 (Ind.Ct.App.2004). In analyzing statutes, our fundamental responsibility is to determine and effect the intent of the legislature. *Pabey v. Pastrick,* 816 N.E.2d 1138, 1148 (Ind.2004), *reh'g denied.*

We do not presume that statutory language "is meaningless and without a definite purpose" but rather seek to give effect "to every word and clause." *Combs v. Cook,* 238 Ind. 392, 397, 151 N.E.2d 144, 147 (1958). "Where possible, every word must be given effect and meaning, and no part is to be held meaningless if it can be reconciled with the rest of the statute." *Hall Drive Ins, Inc. v. City of Fort Wayne,* 773 N.E.2d 255, 257 (Ind.2002). We must assume that the language employed in a statute was used intentionally. *Burks v. Bolerjack,* 427 N.E.2d 887, 890 (Ind.1981). We "will presume that the legislature did not enact a useless provision." *Robinson v. Wroblewski,* 704 N.E.2d 467, 475 (Ind.1998). In interpreting a statute, we must seek to "give it a practical application, to construe it so as to prevent absurdity, hardship, or injustice, and to favor public convenience." *Baker*

---

3. The record contains no evidence about previous dealings between the county and the hospital on emergency detentions.

4. The hospital's brief indicates that the administrators served at least some of the twenty-four-hour commitment in the Jasper County Jail. Appellant's Br. at 9.

*v. State,* 483 N.E.2d 772, 774 (Ind.Ct. App.1985).

*Id.*

The statute that authorizes the emergency detention process, Indiana Code § 12–26–5–1, is as follows:

(a) An individual may be detained in a facility for not more than seventy-two (72) hours under this chapter, excluding Saturdays, Sundays, and legal holidays, if a written application for detention is filed with the facility. The individual may not be detained in a state institution unless the detention is instituted by the state institution.

(b) An application under subsection (a) must contain both of the following:

(1) A statement of the applicant's belief that the individual is:

(A) mentally ill and either dangerous or gravely disabled; and

(B) in need of immediate restraint.

(2) A statement by at least one (1) physician that, based on:

(A) an examination; or

(B) information given the physician; the individual may be mentally ill and either dangerous or gravely disabled.

The statute instructing trial courts on appropriate procedures for emergency detentions, Indiana Code § 12–26–5–2, states as follows:

(a) If a judicial officer authorized to issue a warrant for arrest in the county in which the individual is present endorses an application made under section 1 of this chapter, the application authorizes a police officer to take the individual into custody and transport the individual to a facility.

(b) The expense of transportation under this section shall be paid by the county in which the individual is present.

Section 2(a) gives a trial court the authority to issue a warrant allowing a person eligible for emergency detention to be transported to a "facility," which is defined for purposes of the emergency detention statute as:

a psychiatric hospital, a community mental health center, another institution, a program, a managed care provider, or a child caring institution:

(A) where a mentally ill individual can receive rehabilitative treatment, or habilitation and care, in the least restrictive environment suitable for the necessary care, treatment, and protection of the individual and others; and

(B) that has adequate space and treatment staff appropriate to the needs of the individual as determined by the superintendent of the facility.

The term includes all services, programs, and centers of the facility, wherever located.

Ind.Code § 12–7–2–82(3).[5] Subsection (B) of this definition provides the basis for the hospital's position that, despite the court's order, it may decline to accept the patient if it lacks "adequate space and treatment staff appropriate to the needs of the individual as determined by the superintendent of the facility." I.C. § 12–7–2–82(3)(B).

 As a CMHC, the hospital is subject to certain conditions and requirements. CMHCs perform a vital role in

---

**5.** Each type of facility on this list also is specifically defined in Title 12, at least for some purposes. Ind.Code § 12–7–2–29 ("child caring institution"); § 12–7–2–38 ("community mental health center"); § 12–7– 2–118.8 ("institution"); § 12–7–2–127 ("managed care provider"); § 12–7–2–146 ("program"); § 12–7–2–151 ("psychiatric hospital").

Indiana's mental health system.[6] The State contracts with CMHCs to provide services to tens of thousands of consumers statewide. CMHCs are required to provide a "continuum of care" as required by 440 Indiana Administrative Code 4.1-2-4(d), (e), and (f). CMHCs must directly provide to individuals in their service areas at least the following services: case management, crisis intervention, outpatient services, day treatment, individualized treatment planning, medication evaluation and monitoring, services to prevent unnecessary and inappropriate treatment and hospitalization, and services for drug and alcohol abusers. *Id.* at (d). CMHCs also must supply inpatient care, acute stabilization, and residential services for seriously mentally ill adults but may do so by contracting with other entities rather than directly. *Id.* at (e).

The Division of Mental Health and Addictions establishes exclusive geographic territories to be served by CMHCs. 440 IAC 4.1-3-1. "Each community mental health center (CMHC) is obligated to provide accessible services for all individuals, within the limits of its capacity, in its exclusive geographic primary service area." 440 IAC 4.1-3-2(a). The State's rules also provide a mechanism for a county to resolve complaints about the CMHC serving that county or to shift to a different CMHC if the problems cannot be resolved. 440 IAC 4.1-3-3, 440 IAC 4.1-3-4, 440 IAC 4.1-3-7.

In this proceeding, the trial court sought to use the statutes governing emergency detention to obtain mental health care for an individual who had come before the court on a criminal charge. The individual was well known in the community; the Chief Deputy Sheriff had arrested him several times, and the Chief Deputy Prosecutor was also very familiar with him because of his longstanding involvement in the criminal justice system. The trial court and Chief Deputy Prosecutor stated they had experienced difficulties in obtaining placements at the hospital for other individuals adjudged eligible for emergency detention. The trial court noted that the placement problem had occurred twice earlier in the year. The Chief Deputy Prosecutor also criticized the lack of appropriate placements for emergency detainees.

The problem the trial court identified is significant. The lack of immediate, acute mental health treatment for incarcerated individuals frustrates trial judges whose day-to-day responsibilities include protecting public safety and supporting humane conditions in local jails. This case exemplifies a national trend. "In many communities, jails and prisons have become the largest providers of mental health services ..." Bazelon Center for Mental Health Law, *A New Vision of Public Mental Health,* available at http://www.bazelon. org/issues/general/ publications/newvision/ newvision.pdf (last accessed Jan. 26, 2005). Trial courts should have sufficient tools to

---

**6.** As its appendix under Appellate Rule 50(A)(3), the State has provided the 2002–03 Biennial Report of the Indiana Division of Mental Health and Addiction, from which some of the information in this paragraph is drawn. While this court may properly take judicial notice of a public record such as the Biennial Report, *Wayne Twp. v. Lutheran Hosp.,* 160 Ind.App. 427, 312 N.E.2d 120, 122 n. 2 (1974), the public record should be drawn to the court's attention by motion or, if publicly available, cited as authority. The appellate rules do not permit material to be included in a party's appendix that was not presented to the trial court. Ind. Appellate Rule 50(A)(1) (stating that the appendix contains "those parts of the record on appeal that are necessary for the Court to decide the issues presented"); App. R. 27 (noting that the "record on appeal" consists of clerk's record and all proceedings before the trial court).

address individuals who come before them with significant mental illness. Without such tools, individuals will not receive needed treatment and will instead disrupt the judicial and correctional systems.

With this backdrop, we address the scope of Indiana law governing emergency detention of dangerous or gravely disabled mentally ill individuals. The emergency detention statute authorizes a court to issue a warrant permitting a law enforcement officer to arrest an individual who is mentally ill and dangerous or gravely disabled and transport the individual to "a facility." Ind.Code § 12–26–5–2(a). CMHCs are among the types of institutions defined as "facilities" for this purpose. Ind.Code § 12–7–2–82(3) (defining "facility" as "a psychiatric hospital, a community mental health center, another institution, a program, a managed care provider, or a child caring institution").

The statutory scheme does not end there, however. Rather, a further substantive condition on admission is embedded in the definition of "facility." A "facility" for purposes of the emergency detention statute also must have "adequate space and treatment staff appropriate to the needs of the individual as determined by the superintendent of the facility." I.C. § 12–7–2–82(3)(B).

In construing the statutory scheme governing emergency detentions, this court must look beyond the statute allowing a trial court to commit an individual to a "facility." Ind.Code § 12–26–5–2. The court must also give meaning to the substantive provision, contained in the definition of "facility," permitting the facility's superintendent to decline to receive a committed patient if the facility is unable to provide adequate treatment at that time.

Ind.Code § 12–7–2–82(3).[7] Only by reading these provisions together can the court give effect to the full intent of the General Assembly. *See, e.g., In re K.B.,* 793 N.E.2d 1191, 1198 (Ind.Ct.App.2003) ("[W]e must construe the apparently conflicting statutes together to produce a harmonious statutory scheme and assume that the legislature did not intend conflicting mandates.").

The conclusion that facilities may decline to admit emergency detainees is consistent with the rules governing CMHCs. The rules specify the treatment that CMHCs must provide, either directly or through contracted services, for all sorts of patients. 440 IAC 4.1–2–4(d), (e), (f). But the rules also qualify CMHCs' duties, stating that the services must be provided "within the limits of the capacity of the center." *Id.* at (d). The rules establishing exclusive geographic territories for CMHCs contain similar limitations: "Each community mental health center (CMHC) is obligated to provide accessible services for all individuals, *within the limits of its capacity,* in its exclusive geographic primary service area." *Id.* at 2(a) (emphasis added).

▮ Thus, although the statutory scheme gives trial courts authority to place emergency detainees in a variety of "facilities," the statutory scheme permits facilities to decline patients when they lack the space or staff to provide appropriate treatment. This arrangement may frustrate justice in some situations, perhaps including P.H.'s, but it represents the General Assembly's determination that the ultimate authority over admissions decisions should rest with the institutions themselves. This choice recognizes that

---

**7.** "Superintendent" also is a defined term. "For purposes of IC 12–26, the term means the chief administrative officer of a facility and includes the chief administrative officer's designee." Ind.Code § 12–7–2–188(3).

admissions decisions implicate professional judgment and expertise about treatment alternatives.[8] Facilities are generally in a better position to make admissions decisions than trial courts. The General Assembly's balancing takes into account not only the courts' needs but also the difficulties presented when facilities lack control over the size of the populations they are required to treat.[9]

This conclusion is consistent with other cases that have analyzed restrictions on the mental health system arising from limited resources. The plaintiffs in *Y.A. by Fleener v. Bayh*, 657 N.E.2d 410 (Ind.Ct. App.1995), *trans. denied*, were juveniles seeking inpatient mental health treatment. This Court recognized the severe shortage of state-provided inpatient treatment slots but concluded that only the General Assembly, not the courts, could act to create sufficient treatment slots for those in need. "While we might agree with plaintiffs that provision for only 400 of the some 7,000 children needing residential care, seems, on its face woefully inadequate, we are not at liberty to fashion a degree of care for a particular segment of the class, nor are we enabled to direct the General Assembly to raise funds adequate for the executive to care for all members of the class in an unlimited fashion." *Id.* at 417–18. In *Lo-*

*gansport State Hospital v. W.S.*, 655 N.E.2d 588 (Ind.Ct.App.1995), a trial court attempted to resolve the problem of lack of capacity at one state institution by ordering that 60 new staff members be hired. This court reversed the order because only the General Assembly, not the courts, controls expenditures by state facilities. *See also In re Commitment of A.N.B.*, 614 N.E.2d 563, 565 (Ind.Ct.App.1993) (opining that absent statutory authority, state could not be required to pay for child's private mental health placement); *In re Commitment of T.J.*, 614 N.E.2d 559 (Ind.Ct.App. 1993) (same).

Because of their responsibilities under applicable administrative rules and their contracts with the State, however, CMHCs may perform additional functions relating to emergency detainees. The State's brief raises this possibility. It urges that the trial court's contempt judgment be affirmed, arguing that "[t]he phrase 'within the limits of the capacity of the center' does not give a CMHC the option to say 'no' when an individual is referred by a county within the area the center serves." Br. of Appellee p. 16. The State then argues that the CMHC must "cooperate" with local authorities in determining how P.H. should receive treatment. *Id.* at 18–

---

8. *Amicus* Indiana Council of Community Mental Health Centers, Inc. notes that if CMHCs lose control over admissions decisions, as they would if courts could commit individuals without reference to CMHCs' capacity, the quality of care could be compromised and CMHCs could risk losing accreditations and licensing. Br. of *Amicus Curiae* Ind. Council of Cmty. Mental Health Ctrs., Inc. p. 9–13. In its *amicus curiae* brief, the Indiana Hospital and Health Association also highlights the heavy demand on CMHCs and lack of funding to provide adequate care, emphasizing problems that would arise if CMHCs lost control over admissions. Br. of *Amicus Curiae* Ind. Hosp. & Health Ass'n p. 3–4.

9. Many states have histories of overcrowded mental hospitals that provided inadequate or counterproductive treatment as a result of overpopulation. *See, e.g., Johnson v. Florida*, 348 F.3d 1334 (11th Cir.2003) (addressing consent decree governing mental hospital conditions); *United States v. Tennessee*, 260 F.3d 587 (6th Cir.2001) (addressing procedural issue in action by Department of Justice against state regarding deficient mental health care); *Messier v. Southbury Training Sch.*, 183 F.R.D. 350 (D.Conn.1998) (addressing procedural issue in class action against state institution for mentally retarded).

19.[10]

The State's position is buttressed by language in the CMHC rules. The CMHC is required to provide services including "case management," "crisis intervention," "individualized treatment planning," and "services to prevent unnecessary and inappropriate treatment and hospitalization." 440 IAC 4.1–2–4(d). All of these services are short of admitting the patient as an inpatient at the CMHC, but all would assist in obtaining and coordinating treatment for P.H. in an appropriate setting.[11]

While the ultimate authority over inpatient admission remains with the facility, a CMHC could provide substantial assistance to an emergency detainee through treatment planning or by assisting to locate an appropriate placement or treatment, even if the CMHC were unable to accept the emergency detainee as an inpatient. If no inpatient treatment is readily available for an emergency detainee, obtaining other treatment—which, for some individuals, could involve as little as a method to assure that medications are being taken—can still be beneficial. As with other services required of CMHCs, however-er, these services need be provided only "within the limits of the capacity of the center." *Id.* Nevertheless, assistance within the ambit of CMHCs other services, but short of inpatient treatment, may be very valuable for an emergency detainee. Providing appropriate treatment for an emergency detainee will often entail a close working relationship between court personnel and treatment providers. While this sort of liaison may not always lead to the immediate treatment most desirable for an individual sufficiently in crisis to justify seventy-two-hour detention, it may be the best alternative when other options are not immediately available.

Our opinion should not be read to indicate that a trial court has no role in determining treatment of an emergency detainee, although the emergency detention statute does not permit a trial court to require a particular facility to accept a patient if the facility declines admission because it lacks appropriate capacity for that patient. There are likely to be situations in which a particular facility is full or lacks sufficient, appropriate staff to accept a particular patient at any given time. A

---

10. In its brief, the State only argues that the CMHC must "cooperate," not that it was required to admit P.H. as an inpatient on the record in this case. At oral argument, the State speculated that the trial court found the CMHC in contempt because it refused to cooperate or work with local officials to find an appropriate placement for P.H. The record is silent, however, as to what dealings or conversations with CMHC may have had with relevant local officials regarding P.H.

11. Before the trial court, the prosecutor emphasized that the hospital is the "gatekeeper," Appellant's App. p. 31–32, 35, referring to the function described at Indiana Code § 12–7–2–91.4:

"Gatekeeper", for purposes of IC 12–24, IC 12–25, and IC 12–26, means an entity identified in IC 12–24–12–10 that is actively involved in the evaluation and planning of and treatment for a committed individual beginning after the commitment through the planning of the individual's transition back into the community, including case management services for the individual in the community.

As the hospital correctly points out, the "gatekeeper" function is not implicated in emergency detentions under Indiana Code ch. 12–26–5. It comes into play only after an individual is committed under Indiana Code ch. 12–26–6 or 12–26–7. Relevant statutes require a gatekeeper to be identified when an individual is committed. Ind.Code § 12–24–12–11(a). Although the gatekeeper function is not technically implicated in emergency detentions, the hospital as a CMHC remains responsible in emergency detention situations for case management, crisis intervention, treatment planning and other relevant functions that resemble the gatekeeper function.

facility may decline an admission when its superintendent determines that the facility lacks "adequate space and treatment staff appropriate to the needs of the individual." Ind.Code § 12–7–2–82(3)(B).

Nevertheless, the trial court issuing the emergency detention order may determine a facility's reasons for declining to admit an emergency detainee to ensure that the facility is complying with applicable law. A trial court presiding over a case under Indiana Code chapter 12–26–5 has authority to ensure that a "facility" is following the law in its response to an emergency detention order and that a decision by a "facility" to decline to admit an emergency detainee is in fact predicated on inadequate or inappropriate space or staff. I.C. § 12–7–2–82(3)(B). This authority need not be exercised through the contempt power, but it may be administered by requirements for reports or status conferences to ensure that the facility understands and follows the law.

The trial court, or other appropriate authorities, may also seek a CMHC's assistance in determining an appropriate placement or services for an emergency detainee, and a CMHC may be obligated to assist in treatment planning, case management and other relevant services to the extent permitted by available resources. Cooperation between a trial court, a CMHC, and other relevant institutions and individuals enhances the odds that an emergency detainee will obtain the treatment necessary to stabilize the detainee's condition.

## II. The Contempt Judgment

This analysis of the statutes governing emergency detentions is necessary to examine the trial court's judgment that the hospital acted contumaciously by refusing to admit P.H. as an inpatient. We review judgments of contempt for abuse of discretion. *Mitchell v. Stevenson,* 677 N.E.2d 551, 558–59 (Ind.Ct.App.1997), *trans. denied.* A court has abused its discretion when its decision is against the logic and effect of the circumstances. *Id.* In this case, the hospital and its officers also argues that the trial court violated their statutory and due process rights. We review these issues of law *de novo. Shepherd,* 813 N.E.2d at 1203.

Contempt proceedings are *sui generis,* neither civil nor criminal in nature, even though both of those labels are used to describe certain categories of contempt. *Mitchell,* 677 N.E.2d at 559–60. Generally, contempts have been categorized by the nature and purpose of the sanction imposed. *Int'l Union, UMWA v. Bagwell,* 512 U.S. 821, 826–28, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994). A civil contempt is a violation of a court order resulting in a proceeding for the benefit of the aggrieved party. *Nat'l Educ. Ass'n v. South Bend Cmty. Sch. Corp.,* 655 N.E.2d 516, 522 (Ind.Ct.App.1995). As such, any type of penalty in a civil contempt proceeding must be coercive or remedial in nature. *Id.* In contrast, a criminal contempt is an act directed against the authority of the court that obstructs the administration of justice and tends to bring the court into disrepute. *State v. Heltzel,* 552 N.E.2d 31, 34 (Ind.1990). Thus, a criminal contempt sanction is punitive in nature because its purpose is to vindicate the authority of the court, and it benefits the State rather than the aggrieved party. *Bagwell,* 512 U.S. at 826–28, 114 S.Ct. 2552. The contempt in this case appears to be criminal in nature, in that the sanctions did not abate upon compliance with the trial court's order.[12]

---

12. "A charge of criminal contempt should be prosecuted by the State against the defendant,

Contempt also may be direct or indirect. Direct contempts involve actions in the presence of the court, so that the court has personal knowledge of them. *Pryor v. Bostwick,* 818 N.E.2d 6, 12 (Ind. Ct.App.2004). Indirect contempts, in contrast, undermine the orders or activities of the court but involve actions outside the trial court's personal knowledge. *Williams v. State ex rel. Harris,* 690 N.E.2d 315, 317 (Ind.Ct.App.1997). The contempt at issue in this appeal is indirect, because the actions at issue took place away from the courtroom and outside the personal knowledge of the trial court. An indirect contempt requires an array of due process protections, including notice and the opportunity to be heard. *In re Nasser,* 644 N.E.2d 93, 95 (Ind.1994) (citing former Ind.Code §§ 34–4–7–8, 34–4–7–9, 34–4–8–1).[13] The rule to show cause is governed by Indiana Code § 34–47–3–5, which provides in part:

(a) In all cases of indirect contempts, the person charged with indirect contempt is entitled:

(1) before answering the charge; or

(2) being punished for the contempt;

to be served with a rule of the court against which the contempt was alleged to have been committed.

(b) The rule to show cause must:

(1) clearly and distinctly set forth the facts that are alleged to constitute the contempt;

(2) specify the time and place of the facts with reasonable certainty, as to inform the defendant of the nature and circumstances of the charge against the defendant; and

(3) specify a time and place at which the defendant is required to show cause, in the court, why the defendant should not be attached and punished for such contempt.

(c) The court shall, on proper showing, extend the time provided under subsection (b)(3) to give the defendant a reasonable and just opportunity to be purged of the contempt.

(d) A rule provided for under subsection (b) may not issue until the facts alleged to constitute the contempt have been:

(1) brought to the knowledge of the court by an information; and

(2) duly verified by the oath of affirmation of some officers of the court or other responsible person.

Essentially, this rule fulfills the due process requirement that a contemnor be provided with adequate notice and an opportunity to be heard.

The contempt at issue in this case was far from a model of procedure or substance. The content of the trial court's underlying order; the manner in which the order was provided to the hospital; the procedures surrounding the rule to show cause; and the trial court's conduct of the contempt proceeding all contained errors, although not all those errors provide a basis for reversal.

in an independent action, and should charge that the acts have been done or omitted to be done with the intent to defy the authority of the court." *Hancz v. City of South Bend,* 691 N.E.2d 1322, 1326 n. 3 (Ind.Ct.App.1998). In this case, the contempt was not prosecuted in an independent action.

**13.** In some instances, defendants in indirect contempt proceedings are entitled to an automatic change of judge. Ind.Code § 34–47–3–7. The hospital did not ask for a change of judge in the trial court. Also, the statute explicitly excludes from the automatic change-of-judge procedure "indirect contempts growing out of willfully resisting, hindering, delaying, or disobeying any lawful process or order of court," such as the one in this case. *Id.* at 7(b).

■ The hospital and its officers argue that the contempt judgment should be reversed because the 72–hour commitment order did not specifically name Wabash Valley Hospital. The order, they argue, therefore was not sufficiently specific to serve as a basis for contempt. *See, e.g., Bowyer v. Ind. Dep't of Natural Res.,* 798 N.E.2d 912, 918 (Ind.Ct.App.2003) (finding order's reference to "below the shoreline" too vague to serve as basis for contempt).

This argument is unavailing because the record shows that the hospital did not base its refusal to accept P.H. on the written order, which contained a blank line where the hospital's name would ordinarily go. Rather, the record indicates that officials from the sheriff's office spoke with hospital employees by telephone, informing the hospital that it was directed to accept P.H. as a patient. The hospital's decision to decline to accept P.H. was based on the oral representation of an order directed to the hospital, not the written order. The hospital has not shown how it was harmed by the lacuna in the written order or how it would have acted differently had it been named in the written order. The hospital was informed that the trial court ordered P.H. to be taken as an inpatient at the hospital, and the hospital responded to that information. Due process requires no more. *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 546, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) (finding oral notice of charges may satisfy due process).

■ Relatedly, the hospital and its officers also argue that the hospital was not served with the order, so the provisions of Indiana Code § 34–47–3–1 preclude a judgment of contempt. One prerequisite of a contempt finding under Indiana Code § 34–47–3–1, which establishes procedures for indirect contempt, is that "the process or order has been served upon the person" against whom contempt is sought. This court previously has held that not every technical requirement of the indirect contempt statute must be followed, so long as the contempt defendant's due process rights are respected. *Lasater v. Lasater,* 809 N.E.2d 380, 385 (Ind.Ct.App.2004) (applying Ind.Code § 34–47–3–5).[14] In this case, the hospital knew about the commitment order and understood that the order was directed to the hospital. The hospital therefore has received the notice it was due in relation to the order. *Id.* at 385–86; *Harper v. Boyce,* 809 N.E.2d 344, 350 (Ind.Ct.App.2004). At oral argument, the hospital admitted that its argument would have been the same whatever the content of the written order: it would have argued that it had the right to choose not to accept P.H. as an inpatient under Indiana Code § 12–7–2–82(3)(B). Because the hospital's position is not affected by whether it received the written order or precisely what the order said, it cannot obtain relief based on any technical problems with the order. *See D & M Healthcare, Inc. v. Kernan,* 800 N.E.2d 898, 900–02 (Ind.2003) (holding that where party cites no "cognizable harm" arising from procedural misstep, "immaterial variances from prescribed procedures have no legal fallout").

■ The hospital and its officers raise a more substantial question, however, as to their opportunity to be heard in relation to the contempt. After the State proved that

14. The hospital also has argued that the Rule to Show Cause failed to satisfy certain other requirements of the indirect contempt statute. For example, the Rule to Show Cause filed by the prosecutor was not verified. *See* Ind. Code § 24–47–3–5(d)(2) (stating that facts underlying alleged contempt must be "duly verified by the oath of some officers of the court or other responsible person"). The hospital has not shown how it was harmed by failure to follow the letter of the statute.

the hospital did not admit P.H. as a patient despite the trial court's order, the hospital's attorney informed the trial court that "Mr. Lysinger and Mr. Crowley are both here" and "they are more than willing and able to ... testify this morning about what they've done." Appellant's App. p. 35–36. Rather than hear from the hospital's witnesses, the trial court instead found the hospital and its administrators in contempt. The trial court stated reasons on the record for its decision, which amount to a conclusion that the hospital could advance no justification to excuse compliance with the trial court's order.[15]

 Declining to hear testimony from hospital officials at the contempt hearing deprived the hospital of due process. Due process requires not only notice of the basis for the alleged contempt but also an opportunity to be heard on the record to address the allegations. *Harper*, 809 N.E.2d at 350.

The trial court's decision to limit the hospital's testimony was based on its erroneous view that the hospital would not be able to provide any evidence that would excuse its non-compliance with the order. The trial court's belief that the hospital could have no excuse for declining to admit P.H. was grounded on an improper understanding of the law governing emergency detentions, as discussed in the previous section of this opinion.

At the hearing, the Chief Deputy Sheriff and Chief Deputy Prosecutor expressed unhappiness at what they portrayed as uncooperative conduct by the hospital. The Chief Deputy Sheriff testified that he "had numerous problems with Wabash Valley in the past," and that the hospital's outpatient service was uncooperative in P.H.'s case. Appellant's App. p. 29. The Chief Deputy Prosecutor referred to the "game that's been play[ed]" by the hospital and the "catch 22" position the hospital put her in. *Id.* at 31. On the incomplete record before this court, we cannot determine whether the hospital could have done more to assist in finding appropriate treatment for P.H. The trial court ordered the hospital only to admit P.H., not to provide any other services. Indirect contempt lies only as to "any order lawfully issued," Ind.Code § 34–47–3–1, and because the trial court's order addressed only admission to the hospital, not any other conduct by the hospital, only the determination not to admit P.H. could serve as a basis for contempt.

Statutes governing emergency detention specify that a facility's decision not to admit an emergency detainee can be excused if the facility lacks "adequate space and treatment staff appropriate to the needs of the individual." Ind.Code § 12–7–2–82(3)(B). In this case, the hospital should have been permitted to explain its reasons for declining to admit P.H. so that the trial court could determine whether the hospital was acting in accordance with law. Because the hospital was not provided this opportunity, the contempt judgment must be vacated.

Because the trial court did not hear the hospital's reasons for declining to admit P.H., the contempt judgment is erroneous as a matter of law.[16] We vacate the judg-

---

15. Whether the hospital waived this argument by failing to adequately object before the trial court is a close question. The State argues strongly that the hospital's attorney should have indicated more vociferously that his witnesses should testify before the trial court ruled. It is our view that, under the circum-

stances, the hospital's offer of the witnesses was sufficient to preserve the issue.

16. As *amicus* Indiana Hospital and Health Association points out, the hospital was adjudged in contempt as a non-party. *See In re Commitment of T.J.*, 614 N.E.2d at 561 (holding that non-party cannot be subject of court

ment of contempt and remand this matter for further proceedings consistent with this opinion.

NAJAM, J., concurs.

KIRSCH, C.J., concurs in result with separate opinion.

KIRSCH, Chief Judge, concurring in result.

I fully concur with the majority decision to reverse the contempt finding in this case. I am also in full agreement that cooperation between trial courts, community mental health centers and other institutions and individuals is essential to provide necessary treatment for individuals subject to emergency detention orders.

Where I part with my colleagues is in regard to their conclusion that "A trial court presiding over a case under Indiana Code chapter 12–26–5 has authority to ensure that a 'facility' is following the law in response to an emergency detention order and that a decision by a 'facility' to decline to admit an emergency detainee is in fact predicated on inadequate or inappropriate space or staff." *Opinion*, p. 61. I believe such a conclusion is too broad and undermines the legislative determination that the superintendent of a community mental health center is the one best suited to make admissibility decisions.

In making the determination regarding the admission of a patient subject to an emergency detention order, the superintendent of a community mental health center must balance a myriad of concerns. These range from issues of patient and staff safety to economic and liability concerns to compliance with the requirements and standards of regulatory bodies and accrediting organizations. Moreover, this balancing must occur almost instantaneously under the pressure of the moment presented by the emergency detention order. In making such calls, superintendents should not face being second guessed in contempt proceedings before trial courts themselves under the pressure of a difficult emergency placement. Allowing trial courts to hold superintendents in contempt for exercising their discretion to decline admission to an emergency detention detainee allows the courts to do indirectly what they cannot do directly—make the ultimate determination regarding admission.

In the event that a community mental health center is failing to meet its obligations to the community it serves, there are adequate regulatory and contractual remedies for such failures. Indeed, the trial court here alluded to such remedies in its comments at the contempt hearing. *See Opinion*, p. 54.

order). Indeed, because of the unusual nature of this proceeding—the essence of which is judicial authorization to a law enforcement official to arrest and transport an individual—it is not clear whether there are parties at all. *See* Indiana Judicial Center, *Probate Deskbook for Indiana Judges* § 5.17 (2d ed.2003) (instructing clerks that emergency detentions are not to be assigned cause numbers unless and until the report required by Ind.Code § 12–26–5–5 is the basis for a commitment proceeding). Because the hospital did not raise this issue in the trial court or on appeal, it is waived, *Bank One Trust No. 386 v. Zem, Inc.*, 809 N.E.2d 873, 877 (Ind.Ct.App.2004), *trans. denied*, and because the issue has not been briefed by the parties, we decline to base our decision on it.