**Y.A. by her next friend and Guardian Ad Litem, Michael FLEENER, on her own behalf and on behalf of those similarly situated, Appellants–Plaintiffs,**

v.

**Evan BAYH, in his official capacity as Governor of the State of Indiana; Jeff Richardson, in his official capacity as Secretary of the Indiana Family and Social Services Administration; Robert Dyer, in his official capacity as Director of the Indiana Division of Mental Health; Indiana Division of Mental Health; State of Indiana, Appellees–Defendants.**

No. 49A05–9311–CV–00421.

Court of Appeals of Indiana.

Nov. 8, 1995.

Kenneth J. Falk, Christopher B. Haile, John Jay Boyce, Indianapolis, for Appellants and Class.

Milo Gray, Jr., Dana Long, Indiana Advocacy Services, Indianapolis, for a Number of Intervening Appellants.

Wayne O. Adams, III, David D. Robinson, Johnson, Smith, Densborn, Wright & Heath, Indianapolis, Richard A. Waples, Legal Director, Indiana Civil Liberties Union, Indianapolis, for Amicus Curiae Indiana Civil Liberties Union.

Pamela Carter, Attorney General of Indiana, Terry G. Duga, Deputy Attorney General, Indianapolis, for Appellees.

## OPINION

RUCKER, Judge.

In this class action lawsuit plaintiffs sought an order declaring the legal duty of defendants to provide plaintiffs with long-term psychiatric residential care. Plaintiffs also sought mandatory injunctive relief requiring defendants to provide safe, appropriate, and therapeutic placements. Both sides filed motions for summary judgment. The trial court granted summary judgment in favor of defendants and plaintiffs now appeal raising the following two issues for review:

(1) Do the Indiana Constitution, Article 9, § 1, and laws passed pursuant to that provision, impose an affirmative obligation upon the defendants to develop and provide residential services for members of the class of emotionally disturbed children in this cause?

(2) Did the defendants violate their due process obligations to subclass A, consisting of emotionally disturbed youth in need of residential placement who are in State custody, to safeguard these youth from harm and to provide them with minimally adequate treatment?

## BACKGROUND [1]

At the time this lawsuit was filed over 43,000 Indiana youth under age eighteen, were classified as "seriously emotionally disturbed." [2] Of that figure, over 7,000 youth required treatment in some form of residential placement, either inpatient acute psychiatric care, residential treatment facilities, group homes, or therapeutic foster homes. Inpatient acute psychiatric care is short-term inpatient care in public or private facilities. It is the most restrictive residential placement, but is essential to enable seriously ill youth to have crisis stabilization, acute care, short-term treatment, and comprehensive evaluation. Residential treatment facilities include twenty-four-hour-per-day treatment programs for children and adolescents with emotional, psychological, behavioral or social adjustment problems which are so severe they cannot be addressed by less restrictive means. Residential treatment includes specialized clinical services required for diagnosis, counseling and consultation in providing for adolescents with mental health needs, behavioral disorders, or emotional problems. Group homes are generally single dwelling residences with a family-like atmosphere. They typically serve between four to ten

---

1. Much of the background information is derived from the trial court's nineteen pages of Findings of Fact, Conclusions of Law, and Judgment. Although we are not bound by findings of fact when entered in support of a summary judgment order, *Keskin v. Munster Medical Research Found.* (1991), Ind.App., 580 N.E.2d 354, 362, the findings are particularly helpful here because they lend perspective to our subsequent discussion. Also, neither party to this action challenges the trial court's findings and we accept them as true.

2. Children classified as "seriously emotionally disturbed" are defined as: 1) those persons 17 years of age or younger or those under 22 years of age who are eligible and receiving special education services, 2) who have moderate (with at least one severe) limitations of six months or longer duration affecting certain specified activities, 3) who meet certain diagnostic criteria, and 4) who have perceived unmet needs or who are now actively served in two or more services agencies. *Record* at 273–74.

youths and emphasize independence, often including work and school programs. Therapeutic foster homes are also referred to as alternative families for children. These are essentially private foster homes where the foster parents have been specially trained to handle the needs of the youth placed in their care.

For the 7,000–plus youths in need of some form of residential care, the state of Indiana provides publicly funded placements for only about 400 youths. There are approximately 2,000 beds available in various private facilities licensed by the state for persons who have the ability to pay, have private insurance, or who are eligible for Medicaid. However a significant number of youth and their families do not have insurance, nor do they have the financial ability to pay for private facilities. As for those who are Medicaid eligible, their problems are still not solved. Medicaid will pay for acute inpatient care only for a brief period of time. And the 7,000–plus youths classified as seriously emotionally disturbed require long-term care.

Also, at the time this lawsuit was filed many of the emotionally disturbed children who could benefit from residential placements were already in the custody of the state or its subdivisions through Child in Need of Services (CHINS) proceedings, commitment proceedings, or other means, such as delinquency matters. Some of these youths are placed out of state while awaiting placement. However, many are placed into inappropriate foster homes, temporary shelter facilities, or in acute hospital settings. In sum, it is undisputed that there are many more seriously emotionally disturbed youths who need residential placements than there are residential placements available. As a result these youths may not be placed anywhere at all, may be placed into inappropriate placements, or may spend an inappropriate length of time in what was originally an appropriate facility.

### FACTS

The facts in this case are not in dispute. The named plaintiffs are children under the age of eighteen who suffer a variety of emotional and psychiatric problems with varying degrees of severity. This action began October 16, 1990, when Y.A., by her next friend and *guardian ad litem*, Michael Fleener, filed a class action complaint against Evan Bayh, in his official capacity as governor of the state of Indiana, Joseph Reum, in his official capacity as commissioner of the Indiana Department of Mental Health, the Indiana Department of Mental Health and the state of Indiana.[3] The complaint sought declaratory as well as injunctive relief. Y.A. alleged that she was a ward of the Marion County Department of Public Welfare and that she had numerous emotional and psychological problems. A recommendation had been made that Y.A. be placed in a long-term residential psychiatric facility. However, the Marion County Welfare Department could not place her because no placements were available. Y.A. alleged that defendants were required to develop placements for her and all other persons similarly situated.

Thereafter the complaint was amended to include additional plaintiffs, namely: K.A. by her legal guardians; B.B. by his mother; A.C. by his legal guardian; J.T. by his mother; and M.P. by his mother. In addition the trial court granted motions permitting the following youths to intervene as named plaintiffs and class representatives: S.E.M. by his parents; J.T. by her father and stepmother; D.W. by his mother; N.C. by his mother; and G.M.B by her mother. All the named plaintiffs and intervenors were youths under the age of eighteen who alleged they were emotionally or psychologically disturbed and were in need of residential placements, but none were available. At the time the lawsuit was filed many of the named plaintiffs were in the custody of the state pursuant to Child

3. Due to a reorganizing and renaming of certain state agencies as well as changes in personnel heading the agencies, the trial court substituted the successors as parties, and this action is now brought against: Evan Bayh, in his official capacity as governor of the state of Indiana; Jeff Richardson, in his official capacity as secretary of the Indiana Family and Social Services Administration; Robert Dyer, in his official capacity as director of the Indiana Division of Mental Health of the Family and Social Services Administration; the Indiana Division of Mental Health of the Family and Social Services Administration; and the state of Indiana.

in Need of Services (CHINS) proceedings or through other means.

On September 24, 1991 the trial court certified this matter as a class action. The class is defined as:

All persons under the age of 18 in the State of Indiana who have been identified or diagnosed by a qualified mental health professional as being in need of treatment for emotional disturbances in residential services, and who are not placed in the residential services prescribed or identified as appropriate because of the lack of such services, or because of their inability to afford such services.

*Record* at 293. In addition, the trial court certified subclass A which is defined as:

All persons under the age of 18 in the State of Indiana who are currently in the custody of the State or its subdivisions, and who have been identified or diagnosed by a qualified mental health professional as being in need of treatment for emotional disturbances in residential services, and who are not placed in the residential services prescribed or identified as appropriate because of the lack of such services, or because of their inability to afford such services.

*Record* at 293. On December 24, 1991, defendants filed their motion for summary judgment and on November 25, 1992, plaintiffs filed their cross-motion for summary judgment. Thereafter a hearing was conducted on the motions. On July 13, 1993, the trial court entered an order granting summary judgment in favor of defendants and against plaintiffs. In so doing the trial court entered detailed and extensive findings of fact and conclusions of law. Among other things the trial court determined that the long-term and short-term harm caused to children by inadequate or inappropriate placements is irreparable. The trial court also determined that "[t]he defendants are aware of the severe shortages in placements and the harm engendered thereby." *Record* at 292. Even so, the trial court concluded that the defendants did not breach any constitutional or statutory obligations imposed

on them and as a matter of law were not liable to class plaintiffs. As for the subclass, those youth who are already in the legal custody of the state, the trial court observed that throughout the pendency of this action certain named individual members of the subclass had petitioned the court for injunctive relief to secure long-term residential placements and the relief had been granted. Thus concluded the trial court the defendants have not deprived any member of the subclass of any rights created by the Due Process Clause of the Fourteenth Amendment. This appeal ensued in due course.

## STANDARD OF REVIEW

When reviewing the propriety of a ruling on a motion for summary judgment, this court applies the same standard applicable to the trial court. *Liberty Mut. Ins. Co. v. Metzler* (1992), Ind.App., 586 N.E.2d 897, *trans. denied.* We must consider the pleading and evidence sanctioned by Ind.Trial Rule 56(C) without deciding their weight or credibility. Summary judgment should be granted only if such evidence shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Houin v. Burger* (1992), Ind.App., 590 N.E.2d 593, *trans. denied.* The movant bears the burden of proving the propriety of summary judgment, and all facts and inferences to be drawn therefrom are viewed favorably to the non-movant. *Id.*

## DISCUSSION

### I.

The duty to provide for the mentally ill originates in Article 9, § 1 of the Indiana Constitution which provides:

It shall be the duty of the General Assembly to provide, by law, for the support of institutions for the education of the deaf, the mute, and the blind; and for the treatment of the insane.[4]

Plaintiffs' argument pursuant to that provision is twofold. First, plaintiffs assert that the laws enacted by the legislature establish-

---

4. The term insane as used in the Indiana Constitution encompasses those individuals who are

mentally ill. *In re Commitment of A.N.B.* (1993), Ind.App., 614 N.E.2d 563.

ing the Division of Mental Health and providing for various mental health services represent a delegation of the legislature's duty under Article 9, § 1 to the executive branch of government. Thus, according to plaintiffs, the defendants in this case are bound not only by the statutes enacted by the legislature but must also meet the constitutional standard. Second, plaintiffs contend that the statutes themselves impose a mandatory duty upon the defendants to provide the necessary placements for the youth in the class.

█ We do not agree that the mandate of Article 9, § 1 has been delegated by the legislature to the executive. Indiana Constitution Article 3, § 1 provides that the powers of government are divided into three separate departments: the legislative, the executive including the administrative, and the judicial and that "no person, charged with official duties under one of these departments, shall exercise any of the functions of another, except as in this Constitution expressly provided." The principal function of the legislature is the exercise of its power to enact, alter, and repeal laws. *Maize v. State* (1853), 4 Ind. 342, 348; *Langenberg v. Decker* (1892), 131 Ind. 471, 31 N.E. 190. That power is conferred specifically on the legislative branch, and any attempt by the legislature to entrust the function to another branch of government is unconstitutional. *Hollingsworth v. State Bd. of Barber Examiners* (1940), 217 Ind. 373, 28 N.E.2d 64, 66; *Town of Walkerton v. New York, Chicago & St. Louis R.R. Co.* (1939), 215 Ind. 206, 18 N.E.2d 799, 802, *cert. denied,* 308 U.S. 556, 60 S.Ct. 75, 84 L.Ed. 467; *Kryder v. State* (1938), 214 Ind. 419, 15 N.E.2d 386, 389, *appeal dismissed,* 305 U.S. 570, 59 S.Ct. 154, 83 L.Ed. 359 quoting 1 Cooley's Constitutional Limitations at 224 (8th Ed.). Likewise, the proscription contained in Article 9, § 1 is a responsibility imposed specifically upon the General Assembly and is a function that is by its very nature legislative. The mandate of Article 9, § 1 requires provision "by law" for the treatment of the insane. It is without question that only the legislature may provide "by law." Vested within the general lawmaking authority of the legislature therefore is the power to enact laws affecting the mentally ill. Just as the legislature may not

delegate to another branch of government its general lawmaking authority it may not delegate the duty and corresponding power contained in Article 9, § 1 to provide, by law, for the insane.

Plaintiffs counter that although the legislature may not delegate its general lawmaking authority, it may delegate the responsibility, methods, or details necessary to implement the laws enacted by the legislature. *See Stanton v. Smith* (1981), Ind., 429 N.E.2d 224, 228. Citing *Hovey v. State* (1889), 119 Ind. 395, 21 N.E. 21 (Berkshire, Coffey, Olds, JJ., concurring in result with separate opinions), *criticized Tucker v. State,* (1941), 218 Ind. 614, 35 N.E.2d 270, 295–96, plaintiffs point out that in particular the legislature may commit certain powers to the executive branch in order to implement its duty under Article 9, § 1.

█ It is true that while the power of legislation remains in the General Assembly and cannot be delegated, the power and authority to administer legislative enactments may be and necessarily are delegated to various boards, bodies and commissions. *Dunn v. City of Indianapolis* (1935), 208 Ind. 630, 196 N.E. 528. In *Hovey,* the court specifically held that the legislature could delegate to the executive branch its authority under Article 9, § 1 to appoint trustees for the Hospital for the Insane. *Hovey,* 21 N.E. at 26. The court observed that the duty to make provision by law for the support and maintenance of the Hospital for the Insane was expressly conferred on the General Assembly and "it was left absolutely untrammelled as to the means and agencies which it should employ in executing the high command of the people." *Id.,* 21 N.E. at 24–25. Thus, it was within the legislature's discretion whether to retain the power of appointment or to delegate that power to the governor. *Id.,* 21 N.E. at 26. It does not follow however that where the legislature has delegated certain powers for the execution of its laws that it thereby relinquishes authority over the subject matter or relieves itself of its constitutional obligation. Rather, the responsibility for complying with a constitutional mandate rests ultimately with the legislature. In contrast, the responsibility of the body to whom

a delegation has been made is limited to that of compliance with statutory provisions.

The statutory provisions at issue in this case provide for the establishment of the Division of Mental Health within the Office of the Secretary of Family and Social Services. Ind.Code § 12–21–1–1 to –3; Ind.Code § 12–8–8–1 to –8. The Division is responsible for "apply[ing] the division's resources to ensure that Indiana citizens have access to appropriate mental health and addiction services that promote individual self-sufficiency." I.C. § 12–21–1–1. Among its prescribed duties are:

> (1) The planning, research, and development of programs and methods for the education and treatment of emotionally disturbed children.
>
> (2) The coordination of governmental services, activities, and programs in Indiana relating to such children.
>
> (3) The administration of the state supported services concerned with such children.

I.C. § 12–21–5–2. In addition, the director of the Division shall "[s]tudy the entire problem of mental health, mental illness, and addictions existing in Indiana," I.C. § 12–21–2–3(a)(4), and shall "[e]stablish, supervise, and conduct community programs, either directly or by contract, for the diagnosis, treatment, and prevention of psychiatric disorders." I.C. § 12–21–2–3(a)(10). Effective July 1, 1992, the legislature created the Children's Mental Health Bureau within the Mental Health Division. I.C. § 12–22–3–2. The Bureau has various duties including that of implementing the federal law plan contained in Public Law 99–660 (now codified at 42 U.S.C. § 300x–10). I.C. § 12–22–3–4(5). That plan calls for the establishment and implementation of an organized, community-based system of care for individuals with serious mental illnesses and children with serious emotional and mental disorders. 42 U.S.C. § 300x–11(b)(1).

Whether, as plaintiffs suggest, the foregoing provisions impose a mandatory duty to provide residential treatment facilities for all members of the plaintiff class is a question of statutory construction. Thus we must discern whether in enacting these provisions the legislature intended such a result. *See Superior Constr. Co. v. Carr* (1990), Ind., 564 N.E.2d 281. The best evidence of legislative intent is the language of the statute itself. *Jackson v. Union–North United School Corp.* (1991), Ind.App., 582 N.E.2d 854, *trans. denied.* In construing statutory provisions, the statute must be considered as a whole, each part examined not in isolation but with reference to all other companion provisions. *Indiana Dept. of Public Welfare v. Payne* (1993), Ind., 622 N.E.2d 461, *reh'g denied.* An examination of the statutory scheme of which the above provisions form a part reveals that the legislature did not intend to provide the comprehensive residential services demanded by plaintiffs. To the contrary, the statutes describing services to be provided by the Division of Mental Health reflect a conscious effort to limit services to those available under existing appropriations. For example, I.C. § 12–21–2–3(c) requires that funding for long-term care service settings and state-operated long-term care inpatient beds be provided by the Division through the reallocation of "existing appropriations." Likewise, I.C. § 12–21–5–1.5(2) provides that the Division shall contract with managed care providers to provide care "[w]ithin the limits of appropriated funds." I.C. § 12–24–19–4 contains a similar limitation. *See also* I.C. § 12–24–19–7(c) (Resources for the transitional care program shall come from the total appropriation for the facility.) In addition, I.C. § 12–22–1–4, mandating that each state institution administered by the division provide respite care,[5] provides that a state institution nevertheless is not required to accept a mentally ill individual for respite care if the superintendent of that institution determines that there is

---

5. "Respite care" means temporary institutional or noninstitutional care:
  (1) For a mentally ill individual who:
    (A) Lives at home; and
    (B) Is cared for by the individual's family or other caretaker; and

  (2) That is provided because the family or caretaker is temporarily unable or unavailable to provide needed care. I.C. § 12–22–1–1.

insufficient money, staff or bed space. Whether or not an individual is entitled to treatment under these provisions thus depends on the resources of the Division.

Plaintiffs correctly note that statutes addressing various public welfare needs in this and other jurisdictions have been interpreted to provide the kind of comprehensive coverage sought by plaintiffs here. In *Center Township v. Coe* (1991), Ind.App., 572 N.E.2d 1350, plaintiffs instituted a class action against the Center Township Trustee for allegedly failing to discharge his statutory obligation to provide emergency shelter assistance to the homeless poor. The trial court granted the relief requested, directing the trustee to provide shelter assistance to all class members. This court affirmed based on the provisions of Ind.Code §§ 12–2–1–1 to 12–2–14–48 (now see I.C. §§ 12–20–1–1 to 12–20–28–3) which provided in part that the overseer of the poor in each township shall have the oversight and care of *"all poor persons* in his township." I.C. § 12–2–1–6 (emphasis supplied). It was further provided that whenever the overseer shall ascertain that *"any poor person or persons"* require assistance, he "shall furnish to them such temporary aid as may be necessary for the relief of immediate and pressing suffering...." I.C. § 12–2–1–8 (emphasis supplied), and that "[i]t shall be the duty of the overseer of the poor, on complaint made to him that *any person* within his township is lying sick therein or in distress ... to examine into the case of said person and grant such temporary relief as may be required." I.C. § 12–2–1–20(a) (emphasis supplied). We observed that in the case of poor relief the statutory duty to provide benefits is not limited by practicality, and "[t]emporary lack of funds is not an excuse." *Coe,* 572 N.E.2d at 1358. "At no place in the statutory plan of providing benefits can it be implied that the Trustee's duty may be tempered by lack of sufficient funds. To the contrary, [the statute] details the process by which distressed townships ... may overcome financial difficulties." *Id.* In *Goebel v. Colorado Dep't of Institutions* (1988), Colo., 764 P.2d 785, the court reached a similar conclusion with regard to patients hospitalized for chronic mental illness. *See also Arnold v. Dep't of*

*Health Servs.* (1989), 160 Ariz. 593, 775 P.2d 521; *Association for Retarded Citizens v. Dep't of Developmental Servs.* (1985), 38 Cal.3d 384, 211 Cal.Rptr. 758, 696 P.2d 150; *McGraw v. Hansbarger* (1983), 171 W.Va. 758, 301 S.E.2d 848.

▪ Unlike the statutes in the foregoing cases, the provisions at issue here evince a clear intent by the legislature to limit mental health services to the amount of its annual appropriations. We acknowledge that plaintiffs do not restrict their argument to a matter of statutory interpretation. Their argument has a constitutional thrust separate and apart from any legislation passed to deal with the matter or any appropriation of funds to carry out that constitutional mandate. It is the argument, in this regard, that the constitution places upon the General Assembly the absolute duty to care for the members of this class. At the risk of being too simplistic in our response to this argument, we merely state that the constitutional provision is not without limitations. These limitations may be imposed by common sense, and by the constraints placed upon government to wisely distribute and apportion available funds among the various needs and programs which exist and which must be established for the welfare of all citizens. In short, the constitutional provisions are to be construed in the light of reason and the logical intendment of the framers.

▪ The General Assembly, however, may not avoid the very real intendment of the constitutional mandate to care for the mentally ill and disturbed, by refusing to raise and appropriate adequate funds to provide not unlimited care, but adequate care. In the same vein, if the General Assembly has appropriated adequate funds and has appropriately delegated to the executive branch of state government the duty and responsibility for implementing an carrying out the programs to meet the needs, then the executive may not refuse to carry out its responsibility.

While we might agree with plaintiffs that provision for only 400 of the some 7,000 children needing residential care, seems, on its face woefully inadequate, we are not at liberty to fashion a degree of care for a

particular segment of the class, nor are we enabled to direct the General Assembly to raise funds adequate for the executive to care for all members of the class in an unlimited fashion. While it may be of little or no consolation to an emotionally disturbed youngster who needs but cannot obtain state funded care, the answer seems to lie in the elective process. The citizens of the state who select the legislators and the public officials who implement and direct the various programs required, may make their voices heard. Those public officials in the legislative or executive branch who are failing to carry out their responsibilities may be replaced.

Be that as it may, the unlimited care sought by plaintiffs in this lawsuit is not required by the constitutional provision at issue nor by the various statutes currently in effect. We find no error on this issue.

## II.

While this action was pending, a number of the subclass representatives sought injunctive relief in the trial court to secure long-term residential placements and relief was granted. The trial court thus concluded that the defendants had not deprived any member of the subclass of any rights created by the due process clause of the Fourteenth Amendment. Plaintiffs contend the trial court erred because the class itself consists of thousands of emotionally disturbed youth who have not been placed in residential placements. According to plaintiffs, regardless of the remedy afforded the named subclass representatives, the remaining members of the subclass also deserve to have their rights adjudicated.

6. Plaintiffs' due process claim is brought pursuant to the provisions of 42 U.S.C. § 1983. That statute provides a civil remedy against any "person" who, under color of state law, subjects a citizen of the United States to the deprivation of any rights, privileges, or immunities secured by the federal constitution or federal laws. 42 U.S.C. § 1983; *Bayh v. Sonnenburg* (1991), Ind., 573 N.E.2d 398, *cert. denied*, 502 U.S. 1094, 112 S.Ct. 1170, 117 L.Ed.2d 415 (1992). States, state entities and state officials sued in their official capacities are not "persons" and therefore are not subject to suit under § 1983. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45, 58 (1989).

The issue of whether a named plaintiff holds a claim that is representative of the class as a whole is one generally raised in proceedings incident to a request for class certification. *See Edward D. Jones & Co. v. Cole* (1994), Ind.App., 643 N.E.2d 402; *Arnold v. Dirrim* (1979), Ind.App., 398 N.E.2d 426; *Rosario v. Livaditis,* 963 F.2d 1013 (7th Cir.1992), *cert. denied,* 506 U.S. 1051, 113 S.Ct. 972, 122 L.Ed.2d 127 (1993). Where a class has not yet been certified, the failure of one or more class representatives to "possess the same interest and suffer the same injury" as the class as a whole defeats class certification. *Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 216, 94 S.Ct. 2925, 2929–2930, 41 L.Ed.2d 706 (1974). However, where as here a class has been properly certified and only later does it appear that the named plaintiffs are inadequate class representatives, the claims of the class need not be mooted or destroyed. *East Texas Motor Freight System, Inc. v. Rodriguez,* 431 U.S. 395, 406 n. 12, 97 S.Ct. 1891, 1898 n. 12, 52 L.Ed.2d 453 (1977). Rather, the solution is to permit substitution of the named plaintiffs by new representatives who may properly represent the class. *Stewart v. Winter,* 669 F.2d 328, 334 (5th Cir.1982). The trial court therefore erred in denying relief to the entire subclass based on the relief granted to individual subclass members.

Having determined error however does not end our inquiry. We must next decide whether the defendants have deprived any member of the subclass of any rights created by the Due Process Clause of the Fourteenth Amendment.[6] If so, then properly substituted subclass members would be entitled to

An exception to this rule exists in the case of a state official sued for injunctive relief based on alleged constitutional violations. *Ex Parte Young,* 209 U.S. 123, 159, 28 S.Ct. 441, 453, 52 L.Ed. 714 (1908). In that instance the official is stripped of his official cloak and may be ordered to perform his duties in a manner consonant with the constitution. *Stevens v. Dep't of Pub. Welfare* (1991), Ind.App., 566 N.E.2d 544, 547, *trans. denied,* quoting *O'Brien v. Galloway,* 362 F.Supp. 901, 905 (D.Del.1973). The due process claim in this case thus may be asserted only against the named individual defendants and not against the state or its agencies.

pursue an appropriate remedy. According to plaintiffs such a right does exist. Specifically, plaintiffs contend they have a constitutional right to be "free from harm" and to be provided with "minimally adequate treatment," *Brief of Appellant* at 33, 35, and that defendants have violated that right by failing to provide them with appropriate residential placements. In support plaintiffs cite *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), wherein the court held that a person involuntarily committed to a state institution not only has a right to adequate food, shelter, clothing and medical care, but also has a constitutionally protected liberty interest in safety, freedom of movement and minimally adequate training to ensure safety and freedom from undue restraint. *Id.* at 319, 324, 102 S.Ct. at 2460, 2462. Moreover, plaintiffs point out that the holding in *Youngberg* has been extended to provide protection to children removed from their homes and placed in foster care. *See, e.g., Doe v. New York City Dep't of Social Servs.,* 649 F.2d 134 (2nd Cir.1981), *cert. denied,* 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983) (children in foster care have right to protection from harm); *Taylor ex rel. Walker v. Ledbetter,* 818 F.2d 791 (11th Cir.1987), *cert. denied,* 489 U.S. 1065, 109 S.Ct. 1337, 103 L.Ed.2d 808 (1989) (due process requires that a state insure the continued safety of a child once the state removes the child from her home); *K.H. through Murphy v. Morgan,* 914 F.2d 846 (7th Cir.1990) (state assumption of custody over a child requires the state to act to prevent the child from deteriorating physically or psychologically); *Yvonne L. v. New Mexico Dep't of Human Servs.* 959 F.2d 883, 893 (10th Cir.1992) (children in the custody of the state have a constitutional right to be reasonably safe from harm).

■ However, in each of the foregoing cases the term "harm" is used in the context of a child or other persons suffering physical abuse or neglect. We do not read the foregoing authority as standing for the proposition that a child in the custody of state officials has a constitutional right to be free from some form of undifferentiated harm separate and apart from physical abuse. Likewise, the right to "minimally adequate training" entails only that training which is necessary to avoid unconstitutional infringement of the right to physical safety and freedom from undue physical restraint. *Youngberg,* 457 U.S. at 319, 102 S.Ct. at 2460. The *Youngberg* court specifically rejected the notion that its holding should be construed to provide a general right to treatment for institutionalized persons. *Id.* at 318–19, 102 S.Ct. at 2459–60.

■ Nevertheless, even assuming for the sake of argument that the right to be free from harm encompasses a wider spectrum of injuries than those at issue in the cited cases, plaintiffs' claim still falls outside of the protections of due process. The essence of plaintiffs' claim although framed in terms of a constitutional right to be free from harm is in reality another way of saying they have a constitutional right to receive specific residential placements. It is true "that when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago County Dep't of Social Servs.,* 489 U.S. 189, 200, 109 S.Ct. 998, 1005, 103 L.Ed.2d 249 (1989). It is equally true however that the "Due Process Clause generally confers no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property...." *Id.* at 195, 109 S.Ct. at 1003. To the contrary, a state necessarily has considerable discretion in determining the nature and scope of its responsibilities to persons in its care. *Youngberg,* 457 U.S. at 317, 102 S.Ct. at 2459. Contrary to plaintiffs' contention, there exists no constitutional right to receive specific residential placements.

## CONCLUSION

As to the class, the trial court correctly determined that Indiana Constitution Article 9, § 1 and the statutes enacted pursuant thereto impose no duty upon defendants to provide residential placements for all youth in the class. As to the subclass, the trial court erred in denying relief to the entire subclass based on the relief granted to indi-

vidual members of the subclass. However, the court correctly determined that the defendants did not deprive the subclass of any rights created by the Due Process Clause of the Fourteenth Amendment. We therefore affirm the trial court's grant of summary judgment in favor of defendants.

Judgment affirmed.

SHARPNACK, C.J., and SULLIVAN, J., concur.