**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



**FILED**

Jul 03 2012, 9:31 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**BRUCE A. BRIGHTWELL**
New Albany, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**KATHY BRADLEY**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

|  |  |  |
|---|---|---|
| IN THE MATTER OF THE INVOLUNTARY COMMITMENT OF A.B., | ) ) ) ) ) ) | No. 10A01-1109-MH-483 |

APPEAL FROM THE CLARK SUPERIOR COURT
The Honorable Vicki L. Carmichael, Judge
Cause No. 10D01-0910-MH-1

July 3, 2012

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**NAJAM, Judge**

**STATEMENT OF THE CASE**

A.B. appeals the trial court's order continuing his involuntary regular commitment following a review hearing. A.B. presents several issues for our review, which we consolidate and restate as whether the State presented sufficient evidence to support the trial court's order.

We affirm.

**FACTS AND PROCEDURAL HISTORY**

In approximately November 2000, A.B., who suffers from paranoid schizophrenia, "started to have auditory hallucinations." Respondent's Exh. 3 at 3. A.B. heard voices in his head, and "[a]s the frequency and intensity of the voices progressed they would talk and warn him about people going into his house or setting him up for a crime that would allow police to kill him." Id. Accordingly, he began to "act on these voices to try and prevent things from happening to him." Id. For example, A.B. boarded up the windows on his house to prevent people from breaking in, and he began to carry and sleep with a gun.

On November 2, 2001, A.B. drove to the Green Tree Mall in Clarksville. After visiting a couple of department stores, he returned to the parking lot. There, he saw a man, K.K., whom he recognized as someone he had met in January 2001 while on vacation in Jamaica. A.B. heard voices in his head telling him that K.K. was "setting him up and that [K.K.]'s brother was a dirty police officer who was going to plant drugs in his house" and who would "arrest him and put him in a cell with a homosexual or kill him

and make it look like a suicide." Id. A.B. then dragged K.K. from his car and shot and killed him in front of K.K.'s wife.

The State charged A.B. with murder, and a jury found him not guilty by reason of insanity. The State then filed a petition for A.B.'s involuntary commitment, and, on February 19, 2002, the trial court granted the State's petition and ordered A.B. committed to a state hospital. Since that time, the trial court has continuously reviewed and renewed A.B.'s involuntary commitment.

On December 9, 2009, A.B. filed a motion for hearing to review status, and that hearing was held on June 11 and 30 and February 3 and 23, 2011. Following that hearing, the trial court ordered that A.B.'s involuntary commitment "should continue in full force and effect." Appellant's App. at 29. In support of that order, the trial court made the following findings and conclusions:

## FINDINGS OF FACT

1. Any point identified herein as a finding of fact may be considered a conclusion of law to the extent it may be appropriate to do so, and any point identified herein as a conclusion of law may also be considered to be a finding of fact to the extent it may be appropriate to do so.

2. [A.B.] was found Not Responsible by Reason of Insanity of the crime of murder on January 15, 2002.

3. The facts surrounding the killing are well documented in the Court's record, and are not disputed by [A.B.].

4. It is undisputed that, during a period of psychosis, suffering from delusions and paranoia, [A.B.] killed a complete stranger with no provocation.

5. Following the verdict of not responsible by reason of insanity, pursuant to Indiana Code § 35-36-2-4, the Prosecutor filed a Petition for Involuntary Commitment under Indiana Code § 12-26-7 et seq.

3

6.      The Court entered an Order of Involuntary Commitment on February 20, 2002, and that Commitment order has been continuously renewed by the Court pursuant to Indiana Code § 12-26-15 et seq.

7.      [A.B.] filed his Motion for Hearing to Review Status on October 13, 2009, which constitutes a request for review hearing under Indiana Code § 12-26-15 et seq.

8.      The Court conducted an ongoing review hearing in this matter, recessed and resumed, on each of the following dates:  June 11, 2010[;] June 30, 2010[;] February 3, 2011[;] and February 23, 2011.

9.      Vincent Porter, M.D. is the examining physician for purposes of Indiana Code § 12-26 et seq.  He is qualified as an expert in general psychiatry.  Dr. Porter has been [A.B.]'s treating psychiatrist since November 2008.  Dr. Porter testified on June 11, 2010[;] June 30, 2010[;] and February 3, 2011, on behalf of Madison State Hospital.

10.     George Parker, M.D. is Medical Director for the Division of Mental Health and Addiction.  He is Board Certified in General Psychiatry and Forensic Psychiatry.  (Exhibit 1, Deposition of Dr. George Parker; transcript of 2/23/2011 hearing, pp. 128-129).

11.     Dr. Parker is qualified as an expert in general psychiatry and forensic psychiatry.

12.     Daniel Yohanna, M.D. testified on behalf of Respondent [A.B.]

13.     Dr. Yohanna is Board Certified in Psychiatry and Forensic Psychiatry.  (Transcript 6/11/2010, p. 44).

14.     Dr. Yohanna is qualified as an expert in general psychiatry and forensic psychiatry.

15.     Dr. Yohanna met [A.B.] on only two occasions:  once in early 2008 for approximately three (3) hours, and once on June 11, 2010[,] for approximately thirty (30) minutes.  (Transcript 6/11/2010, pp. 48-49).

16.     Dr. Parker testified that he met [A.B.] three times for a total of two (2) to three and one half (3 1/2) hours.  (Transcript 2/23/11, pp. 154-155.)

17.     Dr. Yohanna's experience with patients like [A.B.] is primarily in Illinois, not Indiana.  (Transcript 6/30/2010, page 61).

18.     Dr. Parker has nine and one half (9 1/2) years experience in Indiana. (Transcript 2/23/2011, page 133).

19.     The Court finds the testimony of all the expert witnesses to be credible; however, the testimony of the examining physician, Dr. Porter, is entitled to greater weight than the testimony of the evaluating experts.

20.     Susan Brown is the state hospital liason for LifeSpring Mental Health Center, the outpatient facility that will be responsible for providing services to [A.B.] upon his discharge from Madison State Hospital. (Transcript 2/23/11, p. 5, 11, 19.)

21.     Because he was found Not Responsible by Reason of Insanity, under Indiana Code § 12-24-12-10(b), [A.B.]'s statutory gatekeeper is the Division of Mental Health and Addiction [("DMHA")].

### Facts Concerning Commitment Criteria under Indiana Code [§] 12-26 et seq.

22.     It is undisputed that [A.B.] suffers from schizophrenia, paranoid type. (Testimony of Dr. Yohanna, testimony of Dr. Parker, testimony of Dr. Porter).

23.     Schizophrenia is a mental illness as defined in Indiana Code § 12-7-2-130.

24.     It is undisputed by all of the experts that schizophrenia is a lifelong illness requiring ongoing treatment.

25.     It is also undisputed that as a result of his mental illness, [A.B.] committed the most dangerous act a human being can commit against another human being, the act of murder.

26.     It is undisputed that prior to the murder, [A.B.] was successfully able to mask his paranoid and psychotic behavior, and that this behavior went unnoticed by his family.

27.      [A.B.] has a demonstrated history of extreme violence.

28.     It is undisputed that the past history of violence is the best predictor of a future risk of violence.  (Exhibit 1, Dr. Parker's deposition, page 16; Dr. Yohanna's testimony, Transcript 6/11/2010, p. 50; Dr. Porter's testimony, transcript 6/30/2010, p. 90.)

5

29. It is undisputed that [A.B.] has not demonstrated violent behavior in the structured setting of Madison State Hospital, while on medication and undergoing therapy.

30. He has, however, demonstrated threatening inappropriate outbursts which give his treating psychiatrist cause for concern. (Transcript 6/30/2010, pp. 100-103, 105.)

31. Although [A.B.] has not demonstrated violent behavior in the structured setting of Madison State Hospital, while on medication and undergoing therapy, none of the expert witnesses testified that he no longer poses a risk of danger to others.

32. In fact, Dr. Porter testified that [A.B.] does continue to pose a risk of dangerousness. (Transcript 6/30/2010, p. 100.)

33. [A.B.] continues to exhibit behaviors that indicate risk for harm to others, including an episode in which Dr. Porter felt threatened, an episode in which [A.B.] became verbally assaultive to the recreational therapist, and an episode in which he began to feel like he did in 2001 as a result of being denied access to a computer. (Transcript 6/30/2010, pp. 53, 100-103, 132.)

34. [A.B.] continues to exhibit residual symptoms of schizophrenia. (Transcript 6/11/2010, pp 17-18; Transcript 6/30/2010, pp. 19, 21, 88, 91, 97-98, 104-105, 114-115).

35. One of the symptoms of schizophrenia is isolation and lack of socializing. (Transcript 6/30/2010, page 104).

36. [A.B.]'s outburst in response to a knock on his door is an indication that he responds poorly to external stressors such as people knocking on his door. (Transcript 6/30/2010, page 103).

37. [A.B.]'s isolating behaviors are concerning to Dr. Porter as "hallmarks of schizophrenia." (Transcript 6/30/2010, page 104).

38. [A.B.] is gravely disabled in that he lacks insight into his illness and exercises poor judgment with regard to stressors and triggers in the community. (Transcript, 6/30/2010, pp 36-37, 81-83; 110-111; Transcript 2/3/2011, pp. 81-82).

39. [A.B.]'s desire to return to the home and community where the murder occurred is an indication that he lacks insight with regard to

stressors and potential triggers of his schizophrenia. (Transcript 6/30/2010, pp. 66-67, 72, 78, 81, 135).

40. Although [A.B.] and his family acknowledge that he suffers from schizophrenia, that this is a lifelong chronic illness, and that he will require medication for the rest of his life, they do not appreciate the significance of his illness and the potential impact of stressors and triggers in the community. (Transcript 6/30/2010, pp. 72, 81). Thus, [A.B.], and his family are in denial about important aspects of [A.B.]'s mental illness. (Transcript 6/30/2010, pp. 39, 69, 78, 83-84).

41. [A.B.] does not display acceptable insight into his mental illness and his risk of relapse. (Transcript 2/3/11, page 30-31).

42. [A.B.] displays lack of insight when he refers to the murder as "a bad turn of events" and discusses his ability to "slowly come out of it" without any medication or treatment. (Transcript 2/3/2011, page 105).

43. In the opinion of Dr. Porter, [A.B.] is at risk of relapse if he returns to his home and the community where he lived when the murder occurred because of the significant number of stressors and triggers. (Transcript 6/30/2010, pp. 72, 81, 97, 103).

44. It is the opinion of the examining physician, Dr. Porter, that Madison State Hospital is the least restrictive environment suitable for the care and treatment of [A.B.]. (Transcript, 6/30/2010, page 105-106; transcript, 2/3/2011, p. 82).

45. Dr. Porter, [A.B.]'s examining physician, does not recommend outpatient treatment at this time.

46. There is nothing in the record to indicate that [A.B.] can enter an outpatient program immediately.

47. The community mental health center (LifeSpring) has an Assertive Community Treatment team known as the ACT team, which provides services to individuals living in the community. (Transcript 2/3/11, pp. 6-7).

48. The ACT team does not serve individuals living in group homes. (Transcript 2/3/11, page 20).

49. Susan Brown, from LifeSpring, testified that the ACT team did not have any openings, that LifeSpring did not have an available group home

7

placement, and that [A.B.] could not enter an outpatient program through LifeSpring immediately. (Transcript 2/3/11, pp. 21, 25).

50.     It is undisputed that [A.B.] will always require some level of court supervision. (Dr. Yohanna testimony, transcript 6/11/2010, pp. 62, 66, 69; Exhibit 1, Dr. Parker Deposition, page 22; Transcript 2/23/2011, p. 138).

51.     Indiana does not have a conditional release program like those offered in some other states. (Transcript 2/23/11, p. 151).

52.     In the absence of a commitment order under Indiana Code § 12-26, there is no mechanism under Indiana statutes for court supervision of [A.B.] or for ensuring his compliance with a treatment plan or medication regimen.

53.     The record is replete with evidence, and the Court finds that [A.B.] suffers from a mental illness, namely schizophrenia, and that he is potentially dangerous as a result of his mental illness. He is also gravely disabled in that he lacks insight into his mental illness, and his judgment is impaired with regard to his past serious violent history and the stressors and triggers in the community.

## CONCLUSIONS OF LAW

1.     Any point identified herein as a finding of fact may be considered a conclusion of law to the extent it may be appropriate to do so, and any point identified herein as a conclusion of law may also be considered to be a finding of fact to the extent it may be appropriate to do so.

2.     Mental Health Commitments are creatures of statute, specifically Indiana Code 12-26 et seq.

3.     Because the proceedings are creatures of statute, only the rights set forth in the statute apply in commitment proceedings. See State v. Superior Court of Marion County, 233 Ind. 563, 122 N.E.2d 9, 10 (Ind. 1954).

4.     Likewise, because mental health commitments are a creature of the legislature, the Court has only that jurisdiction and authority conferred upon it by the statute. Bemham v. State of Indiana, 637 N.E.2d 133, 136 (Ind. 1994). "A court has no power to do anything which:  is not authorized by law and when its procedure is defined by a special statute, its judicial function is essentially controlled thereby, and the remedy is confined to the mode prescribed. . . ." State ex rel. Root v. Circuit Court of

8

<u>Allen County</u>, 259 Ind. 500, 289 N.E.2d 503, 505 (1972), citing <u>Underhill v. Franz</u>, 230 Ind. 165, 101 N.E.2d 264 (1951).

5.      A court cannot judicially legislate or rewrite statutes created by the General Assembly.  <u>See</u> <u>generally</u> <u>Matter of the Estate of Parson v. Grabert</u>, 344 N.E.2d 317, 320 (Ind. Ct. App. 1976); <u>see also</u> <u>Meade Electric Company v. Hagberg</u>, 159 N.E.2d 408, 414 (Ind. Ct. App. 1959).

6.      In addition to the statutory constraints, the court's jurisdiction in mental health commitments is constrained by the separation of powers clause of Article III, Section 1 of the Indiana Constitution.  <u>Y.A. by Fleener v. Bayh</u>, 657 N.E.2d 410 (Ind. Ct. App. 1995), <u>trans. denied</u>.  The powers of the three branches of state government are exclusive with respect to the duties assigned to each.  <u>State v. Morgan Superior Court</u>, 249 Ind. 220, 231 N.E.2d 516, 519 (1967).  "[E]ach branch of the government has specific duties and powers that may not be usurped or infringed upon by the other branches of government."  <u>Smith v. State</u>, 829 N.E.2d 1021, 1025-1026 (Ind. Ct. App. 2005).

7.      The DMHA, a division of the Indiana Family and Social Services Administration, is the state agency mandated by statute to provide certain mental health services to the population throughout the State of Indiana. Indiana Code § 12-11-1.1 et seq.*, § 12-11-2.1 et seq.*, and § 12-24 et seq.*; <u>Y.A. by Fleener v. Bayh</u>*, 657 N.E.2d 410 (Ind. Ct. App. 1995).  The legislature provides funding to the agency for purposes of fulfilling its statutory mandate, and the agency must provide those services within the constraints of its budget.  As a result, the overall statutory scheme and supporting case law give the agency, and its state-operated facilities, wide discretion to manage bed space and provide services and programs.  <u>See generally</u> <u>Logansport State Hospital v. W.S.</u>, 655 N.E.2d 588 (Ind. Ct. App. 1995) (holding that a trial court violated separation of powers by ordering the division to hire additional staff because it is the express duty of the General Assembly to provide for the staffing and maintenance of facilities).

8.      The agency's discretion to manage its budget within the legislative allotments was discussed and confirmed by the Court of Appeals in <u>In Re Contempt of Wabash Valley Hospital, Inc.</u> 827 N.E.2d 50, 60 (Ind. Ct. App. 2005).  <u>See also</u> <u>In Re the Commitment of A.N.B.</u>, 614 N.E.2d 563 (Ind. Ct. App. 1993); [and]

> Indiana Courts have recognized the fiscal restraints under which DMHA operates and have acknowledged that it is a legislative function to resolve those burdens, not a judicial one.

Y.A. v. Bayh, 657 N.E.2d at 415.

9.      The Court cannot dictate treatment conditions on an involuntary civil commitment, nor can it create a discharge plan that requires a level of services to be provided or DMHA resources to be dedicated.

10.      This matter is before the Court on review of involuntary commitment under Indiana Code § 12-26-15 et seq.

11.      In proceedings under Indiana Code 12-26 et seq., a court may enter an order of involuntary commitment if the petitioner proves by clear and convincing evidence that the individual is mentally ill and dangerous to himself or others, or gravely disabled, as a result of mental illness. Indiana Code 12-26-2-5(e)(1). See generally C.J. v. Health and Hosp. Corp. of Marion County, 842 N.E.2d 407, 409 (Ind. Ct. App. 2006); Indiana Code § 12-26-7-1 et seq. Deal v. State, 446 N.E.2d 32 (Ind. Ct. App. 1996).

12.      The trial court has discretion in weighing the evidence and making the determination, and the judgment of the court will not be reversed on appeal as long it is a conclusion that a reasonable person could have drawn, even if other reasonable conclusions are possible. See generally C.J. v. Health and Hosp. Corp. of Marion County, 842 N.E.2d 407, 409 (Ind. Ct. App. 2006) citing In re Commitment of Heald, 785 N.E.2d 605; M.Z. v. Clarian Health Partners, 829 N.E.2d 634, 637 (Ind. Ct. App. 2005), trans. denied.

13.      There is no right to treatment in the community rather than treatment in a state-operated facility. Phillips v. Thompson, 715 F.2d 365 (7th Cir. 1983). See also Society for Goodwill to Retarded Children, Inc. v. Cuomo, 737 F.2d 1239 (2nd Cir. 1984).

14.      Moreover, it is nearly a truism that the opinion and testimony of a treating physician should outweigh the opinion of a nontreating physician. Although Indiana Courts have not specifically addressed this issue, the Seventh Circuit Court of Appeals has addressed this issue multiple times and has consistently held that the treating physician's opinion is given greater weight than that of a non-treating physician. See generally Boiles v. Barnhart, 395 F.2d 421 (7th Cir. 2005); Clifford v. Apfel, 227 F.3d 863 (7th Cir. 2000); Whitney v. Schweiker, 695 F.2d 784 (7th Cir. 1982); Cummins v. Schweiker, 670 F.2d 81 (7th Cir. 1982).

15.    While this court is not required to apply the Seventh Circuit case law in this case, the case law is persuasive authority and presents a sound theory that the court should follow herein.

16.    The Court finds the testimony of all the expert witnesses to be credible; however, the testimony of the examining physician, Dr. Porter, is entitled to greater weight than the testimony of the evaluating experts.

17.    In addition, lesser weight is given to the testimony of Dr. Yohanna because he lacks familiarity with Indiana law and the statutory scheme specific to mental health commitments in Indiana.

18.    In order for the Court to enter either an inpatient or outpatient commitment order, the Court must find, by clear and convincing evidence, that the respondent is either dangerous or gravely disabled as a result of a mental illness.  Indiana Code § 12-26-7-5; Indiana Code § 12-26-14 et seq.

19.    In addition to the criteria set forth above, in order for the Court to enter an outpatient commitment order, the examining physician must recommend outpatient commitment, and a representative from the outpatient commitment program must report to the Court that the individual can enter the outpatient treatment program immediately.  Indiana Code § 12-26-14-1; Indiana Code § 12-26-14-2.

20.    Indiana Code § 12-7-2-53 defines "dangerous" as "a condition in which an individual as a result of mental illness, presents a substantial risk that the individual will harm the individual or others."  Indiana Code § 12-7-2-53.

21.    Dangerousness "must be shown by clear and convincing evidence indicating that the behavior used as an index of a person's dangerousness would not occur but for the person's mental illness." Commitment of MM v. Clarian Health Partners, 826 N.E.2d 90, 97 (Ind. Ct. App. 2005), trans. denied (quoting Commitment of C.A. v. Center for Mental Health, 776 N.E.2d 1216, 1218 (Ind. Ct. App. 2002)).

22.    A trial court is not required to wait until harm has nearly or actually occurred before determining that an individual poses a substantial risk of harm to others. See MZ., 829 N.E.2d at 638 (citing Matter of Commitment of Gerke, 696 N.E.2d 416, 421 (Ind. Ct. App. 1998) (holding that a commitment premised upon a trial court's prediction of dangerous future behavior, without prior evidence of the predicted conduct, was valid, and observing "[t]he old adage of 'the dog gets one bite'" does not, and should not, apply in the context of commitment proceedings, despite the severe

restrictions on liberty imposed by commitment to a mental facility)). <u>C.J. v. Health & Hosp. Corp. of Marion County,</u> 842 N.E.2d 407, 410 (Ind. Ct. App. 2006).

23.    For purposes of involuntary commitment, "gravely disabled" is defined as:

> a condition in which an individual, as a result of mental illness, is in danger of coming to harm because the individual: (1) is unable to provide for that individual's food, clothing, shelter, or other essential human needs; or (2) has a substantial impairment or an obvious deterioration of that individual's judgment, reasoning, or behavior that results in the individual's inability to function independently.

Indiana Code § 12-7-2-96; <u>A.L. v. Wishard Health Services, Midtown Cmty. Mental Health Ctr.,</u> 934 N.E.2d 755, 760 (Ind. Ct. App. 2010), <u>trans. denied,</u> 950 N.E.2d 1208 (Ind. 2011).

24.    Based upon the evidence presented, the Court now finds by clear and convincing evidence that [A.B.] meets the commitment criteria set forth in Indiana Code § 12-26 et seq.

25.    Specifically, the Court finds that [A.B.] presents a risk of danger to others and also finds that he is gravely disabled in that he lacks insight into his illness and his judgment is impaired with regard to his illness, the ramifications of the illness, and potential triggers and stressors in the community were he to return there.

26.    [A.B.] requires ongoing court supervision in a structured setting.

27.    The Court does not have statutory authority to enter an outpatient commitment order because the criteria are not met under Indiana Code § 12-26-14-1.

28.    The Court's jurisdiction herein is constrained by the governing statutes and the Doctrine of Separation of Powers.

29.    The Court cannot order DMHA to provide placements and services that do not exist or are not presently available.

30.    The least restrictive environment suitable for [A.B.]'s care and treatment is Madison State Hospital.

31. Indiana Code § 12-26-15-3 states as follows, in pertinent part: The right to review or dismissal of the regular commitment or therapy order **is limited to one (1) review each year,** unless the court determines that there is good cause for an additional review. (Emphasis added).

32. Thus, under the clear language of Indiana Code § 12-26-15-3, the patient's right to a hearing is limited to one per year unless good cause is shown.

33. The Court finds that there is no good cause for an additional review; therefore, the next periodic report will be due one year from the date of this Order.

34. Accordingly, the Court now enters the following Order:

### ORDER CONTINUING REGULAR COMMITMENT FOLLOWING REVIEW HEARING

Based upon the foregoing Findings of Fact and Conclusions of Law, the Court now **ORDERS** as follows:

1. That the Order of Regular Commitment herein is not terminated, and the involuntary regular commitment should continue in full force and effect.

2. Accordingly, Respondent is committed to Madison State Hospital until discharged or until the Court terminates the commitment.

3. That the head of the facility, his designee or the attending physician submit a Periodic Report on said patient no later than one year from the date of this Order, at which time the treatment plan will be re-evaluated by the Court.

4. Pursuant to Indiana Code § 12-27-5-2, the designated facility is granted an Order to Treat unless Respondent does not substantially benefit from the medications. The Order to Treat shall be re-evaluated by the Court upon the filing of the Periodic Report.

Appellant's App. at 16-29 (emphases original). This appeal ensued.

13

## DISCUSSION AND DECISION

A.B. challenges several of the trial court's findings and conclusions as clearly erroneous and contends that the evidence is insufficient to support the continuation of his involuntary commitment. When reviewing sufficiency of the evidence, we look only at the evidence and reasonable inferences therefrom most favorable to the trial court's judgment. J.S. v. Ctr. for Behavioral Health, 846 N.E.2d 1106, 1111 (Ind. Ct. App. 2006), trans. denied. We may not reweigh the evidence or judge the credibility of the witnesses. Commitment of M.M. v. Clarian Health Partners, 826 N.E.2d 90, 96 (Ind. Ct. App. 2005), trans. denied. "If the trial court's commitment order represents a conclusion that a reasonable person could have drawn, we will affirm the order even if other reasonable conclusions are possible." Id.

Further, where, as here, the trial court enters specific findings and conclusions, we review the trial court's order for clear error, setting aside the judgment only where there are no facts or inferences to support the findings and conclusions leaving us with a firm conviction that a mistake has been made. Alexander v. Alexander, 927 N.E.2d 926, 933-34 (Ind. Ct. App. 2010), trans. denied. We review findings and conclusions in a two-step process. We first determine whether the evidence supports the findings, and then we determine whether the findings support the judgment. Id. at 934. We neither reweigh evidence nor assess the credibility of witnesses, and we consider only the evidence that is most favorable to the judgment. Id.

A "regular commitment" is one where an individual is alleged to be mentally ill and either dangerous or gravely disabled and whose commitment is reasonably expected

14

to require custody, care, or treatment in a facility for more than ninety (90) days. Indiana Code § 12-26-7-1. At least annually, and more often if directed by the court, the superintendent of the facility or the attending physician shall file with the court a review of the individual's care and treatment. Ind. Code § 12-26-15-1. The trial court then may conduct a hearing pursuant to Indiana Code Section 12-26-15-2.

Here, in essence, A.B. contends that the evidence presented at the review hearing shows that he should be released from the state hospital and placed in an outpatient therapy program. In support of that contention, A.B. maintains that the trial court clearly erred when it: found that it did not have the authority to place A.B. in an outpatient program; found that A.B. is gravely disabled; and found that A.B. is dangerous. We address each contention in turn.

**Outpatient Therapy Program**

Indiana Code Section 12-26-14-1 provides that the trial court may order an individual committed under Article 12-26 to enter an outpatient therapy program if the court finds that the individual is:

(1) mentally ill and either dangerous or gravely disabled;

(2) likely to benefit from an outpatient therapy program that is designed to decrease the individual's dangerousness or disability;

(3) not likely to be either dangerous or gravely disabled if the individual complies with the therapy program; and

(4) recommended for an outpatient therapy program by the individual's examining physician.

(Emphasis added). Because the statute is written in the conjunctive, all four elements must be satisfied before the trial court may order placement in outpatient therapy. See J.M.F. v. State, 721 N.E.2d 267, 269 (Ind. Ct. App. 1999).

Here, the evidence supports the trial court's determination that A.B. is not eligible to be placed in an outpatient therapy program. Dr. Porter, A.B.'s examining physician, testified that "[A.B.] needs to be in Madison State at this time. Outpatient therapy is just not what I'm recommending." Transcript at 313. Because the fourth element of the statute is not satisfied, A.B. cannot demonstrate that the trial court erred when it concluded that it could not place A.B. in outpatient therapy.[1]

To the extent that A.B. argues that the "overall statutory scheme" gives the trial court the "power" to place A.B. in outpatient therapy despite the plain language of Indiana Code Section 12-26-14-1, that argument is not well taken. Brief of Appellant at 16. First, we are not persuaded that any provisions of the statutory scheme are in conflict. Second, A.B. does not explain how the trial court should make a determination on the question of placement in the "appropriate facility" without relying on evidence, such as the recommendation of the examining physician. Brief of Appellant at 17. The trial court's conclusion that A.B. shall not be placed in an outpatient therapy program is not clearly erroneous.

## Gravely Disabled

A.B. also contends that the trial court's conclusion that he is gravely disabled is clearly erroneous. Indiana Code Section 12-26-12-7 provides that an individual can be

---

[1] We need not address the evidence regarding the other three elements because, again, all four elements must be supported by the evidence.

16

committed only if he is mentally ill and either dangerous or gravely disabled. Here, A.B. challenges the sufficiency of the evidence to support both the dangerous and gravely disabled elements, but the evidence need only support a determination of either of those elements to support continued commitment. Because we find the evidence sufficient to support the trial court's conclusion that A.B. is gravely disabled, we need not address whether he is also dangerous for purposes of the statute.

Indiana Code Section 12-7-2-96 provides that gravely disabled, for purposes of Article 12-26, means a condition in which an individual, as a result of mental illness, is in danger of coming to harm because the individual: (1) is unable to provide for that individual's food, clothing, shelter, or other essential human needs; or (2) has a substantial impairment or an obvious deterioration of that individual's judgment, reasoning, or behavior that results in the individual's inability to function independently. Here, the trial court made a determination based on subsection (2).

A.B. maintains that the evidence is insufficient to show that he has a substantial impairment or an obvious deterioration of his judgment, reasoning, or behavior that results in his inability to function independently. In particular, A.B. asserts that: the trial court clearly erred when it cited "the potential problems that could occur if [A.B.] were to return to his home town, because the potential triggers and stressors if he were to return there[;]" the evidence does not support the trial court's determination that A.B. lacks insight into his mental illness; the evidence does not support the trial court's determination that A.B. is in denial about his mental illness; and the evidence does not

17

support the trial court's finding that A.B.'s family is in denial "about important aspects of [A.B.]'s mental illness." Brief of Appellant at 19, 25. We cannot agree.

When Indiana Code Section 12-7-2-96(2) is at issue, the trial court need not find that the person in question is incapable of providing himself or herself with food or clothing, nor does it need to find that the person is dangerous, before it can conclude that the person is gravely disabled. See A.L. v. Wishard Health Servs., Midtown Cmty. Mental Health Ctr., 934 N.E.2d 755, 762 (Ind. Ct. App. 2010), trans. denied. Here, with regard to A.B.'s potential return to his home community, Dr. Porter testified that

> returning to an area that, where someone has been killed and all the friends and families and associates are still, I would think, still in that area [sic]. My last conversation with him is that he felt that was no problem. That's a risk. I think that's a definite risk, but he doesn't see it as a risk and that's one thing that says his insight is not acceptable yet. Returning to his place of employment, potentially that's going to happen, that's another risk factor. . . . [His work] could have also been contributory to his psychotic break.

Transcript at 260. And with regard to A.B.'s lack of insight into and denial of his mental illness, Dr. Porter testified as follows during the review hearing:

> Q:      Now when you say that he's not taking care of himself now, can you tell us what you mean by that?
>
> A:      It goes back to again, his lack of insight and denial. I'm giving him multiple repeated opportunities to discuss, openly, his mental illness, certain behaviors. His reply, as of a few days ago, [was] that he has no mental illness[.]
>
> * * *
>
> Q:      Has [A.B.], [sic] how many times did [A.B.] ever state that he should have never been put in a psychiatric hospital?
>
> A:      He said that very forcefully in an angry tone once. He said it in general terms when I first met him back in November of 2008.

* * *

A:    It, no, it's clear to me he's in denial. He thinks that he's fine or at least that's what he's telling me.

* * *

A:    He minimizes his mental illness, if he's not denying it, he minimizes it.

* * *

Q:    And when he tells you he doesn't have anything he needs to work on, does that concern you?

A:    Very much so.

Q:    Why?

A:    It goes back to denial, minimizing – everything is fine. There's no need to really talk about this anymore. I'm ready to go and I'm not in agreement with that. He's not ready to go yet.

Id. at 21, 37-38, 165. Finally, Dr. Porter testified that another physician informed him that "the family is in denial, that there's a real problem" because there was a concern that A.B.'s parents were "trying to stifle [A.B.]'s discussion of his general psychosis or delusions or hallucinations, something to that effect. [His parents] think it would be best not to talk about it." Id. at 169-70.

A.B.'s argument on appeal amounts to a request that we reweigh the evidence, which we will not do. Dr. Porter testified that the trial court should keep the regular commitment in place because if A.B. were to be released he "poses a risk of rapid decompensation and relapse in the community." Id. at 195. And Dr. Porter testified further that A.B. is "still gravely disabled." Id. at 196. We hold that the evidence supports a determination that A.B. has a substantial impairment or an obvious

19

deterioration of his judgment, reasoning, or behavior that results in his inability to function independently. The trial court's conclusion that A.B. is gravely disabled is not clearly erroneous.

## Conclusion

None of the trial court's findings or conclusions are clearly erroneous. The evidence supports the trial court's determination that A.B. cannot be placed in an outpatient therapy program and that he is gravely disabled such that his placement at the state hospital should continue.

Affirmed.[2]

RILEY, J., and DARDEN, J., concur.

---

[2] A.B. also contends that the State is required by the United States Constitution and Indiana statute "to provide reasonable treatment to [A.B.] to improve his condition." Brief of Appellant at 31. A.B. maintains that "if, in fact, [A.B.] does suffer from lack of insight into his mental illness to such a degree that it serves as a barrier to his discharge, then [the state hospital] failed to recognize and treat that from 2003 to 2009." Id. Thus, A.B. alleges that "it would be a violation of Due Process for the State of Indiana to continue to confine [A.B.] at [the state hospital] for that reason." Id. at 31-32. We find this argument specious and A.B. does not support these contentions with cogent reasoning. Accordingly, we do not address his contentions on this issue.